**Nir S. BINUR, M.D., Petitioner,**

v.

**Donna JACOBO, Respondent.**

No. 02–0405.

Supreme Court of Texas.

Argued April 23, 2003.

Decided May 7, 2004.

---

Diana L. Faust, R. Brent Cooper, Devon J. Singh, Ashley Elizabeth Frizzell, Cooper & Scully, P.C., Dallas, Greg C. Wilkins, Gilbert I. "Buddy" Low, J.B. Whittenburg, Orgain Bell & Tucker, L.L.P., Beaumont, for Petitioner.

Paul F. Waldner, Bryan Marshall, Waldner & Associates, Houston, for Respondent.

Justice OWEN delivered the opinion of the Court.

The issues in this medical malpractice suit have narrowed as the case has proceeded. Although the plaintiff Donna Jacobo originally asserted a number of counts of negligence against the defendant Nir Binur, a physician, Jacobo has since confined her complaints to her contention that Binur failed to obtain her informed consent to the surgical removal of both her breasts. She contends that Binur told her that she would definitely develop breast cancer and that this was the reason she consented to a prophylactic bilateral mastectomy.

After a trial in which a jury was unable to agree on a verdict and a mistrial was declared, the trial court granted summary judgment in Binur's favor. Jacobo appealed, and a divided court of appeals reversed and remanded, concluding that fact issues exist.[1] We hold that although Jacobo might have pursued a claim against Binur for negligence in reaching his prognosis, an erroneous prognosis that is the basis for recommending surgery cannot be the basis of a cause of action for lack of informed consent. Because informed consent is the only claim Jacobo has pursued, we reverse the court of appeals' judgment and render judgment for Binur.

1. 70 S.W.3d 330.

## I

The summary judgment record includes affidavits, excerpts from testimony adduced at trial, and documentary evidence. The record reflects that fourteen years before Donna Jacobo underwent the mastectomy at issue in this case, she had a lump removed from her breast that proved to be benign, and that she had another benign lump removed seven years later. In the summer before her mastectomy, her mother died of breast cancer. Three months after her mother's death, Donna Jacobo detected another lump in her breast. She consulted her primary care physician, who examined her and ordered a mammogram. Jacobo's breasts had fibrocystic tissue, which made it more difficult to interpret the mammogram. Jacobo's physician referred her to a general surgeon, Dr. John Schmidt. Schmidt reviewed Jacobo's mammogram, and she told him about her prior lumpectomies, her mother's death, and the fact that her maternal grandmother had survived breast cancer.

After this initial consultation, Dr. Schmidt reported in a note to Jacobo's primary care physician that Schmidt's diagnosis was: "(1) Probable fibrocystic disease (2) Very [underscored three times] strong risk of developing breast ca[ncer]." Schmidt's recommended treatment was: "(1) Re-examine in 3 mos. (2) Strongly [underscored twice] consider referral to plastic surgeon for possible sub[cutaneous] mastectomy & implants." Donna Jacobo's affidavit states that at her initial consultation with Dr. Schmidt, he recommended a bilateral mastectomy, but she "decided against the proposed surgical removal of my breasts." She explained, "I felt that this was a rather extreme mode of treatment for preventing a disease that I did

not have—especially in light of the fact that my previous lumps had been benign."

Dr. Schmidt referred Jacobo to Binur, a plastic surgeon. Binur, like Schmidt, recommended that Jacobo undergo a mastectomy. Jacobo's affidavit states, "When I questioned Dr. Binur about my risk of developing breast cancer, he told me that it wasn't a question of *if* I required it, but more of a question of *when* it would happen. Essentially, he told me that it was a certainty that I would develop the disease."[2] Binur disputes that he told Jacobo that it was certain she would develop breast cancer, but in our review, we accept all that Jacobo said as true.[3]

After meeting with Binur, Jacobo returned to see Dr. Schmidt and told him that she had decided to proceed with the surgery. Before surgery, Jacobo signed a written consent form that identified both Schmidt and Binur in the blank for "PHYSICIAN'S/SURGEON'S NAME." She consented to a "Bilateral simple mastectomy, tissue expanders." All parties and experts agree that two distinct procedures were performed on Jacobo during this surgery. The first was the bilateral mastectomy, and the second was partial breast reconstruction with the insertion of tissue expanders. It is also undisputed that Dr. Schmidt performed the mastectomy with the assistance of Binur, although the extent of Binur's participation and the legal duty he owed to Jacobo as a result is disputed. Binur performed the reconstruction procedure, which is no longer at issue in this case.

Binur continued to treat Jacobo after this initial surgery, and she alleged that as a result, she experienced pain, deformity, and other ill-effects. We will not detail her further treatment by Binur since it is no longer part of Jacobo's claim. We note only that Binur performed three more surgical procedures and that Jacobo then consulted other surgeons and had three additional surgical procedures to remedy Binur's alleged negligence in reconstructing her breasts.

Jacobo sued Schmidt and Binur. The trial court granted summary judgment in Schmidt's favor and severed the suit against him. The remaining claims against Binur proceeded to a jury trial. Both Binur and Schmidt, as well as experts for Jacobo and Binur, testified. Before the case was submitted to the jury, Jacobo waived her claims against Binur pertaining to his treatment of her after the mastectomy and her claim that Binur was negligent in performing the reconstruction procedure when the mastectomy was performed. The only claims she pursued were those related to Binur's role in the mastectomy. As noted above, at the conclusion of the evidence, the jury was unable to reach a verdict, and the trial court declared a mistrial.

Binur then moved for summary judgment under Texas Rules of Civil Procedure 166a(b) and 166a(i). Binur contended that as a matter of law he was not negligent and that he owed no duty to Jacobo to obtain her informed consent for the mastectomy. He also contended that if he owed a duty, informed consent was properly obtained. Finally, he contended that any failure to obtain informed consent was not a proximate cause of injury or damages to Jacobo. The trial court granted this motion, reciting in the judgment that: 1) Binur was not negligent as a matter of law; 2) he had no duty to obtain informed consent for the mastectomy; 3) informed

---

**2.** Emphasis in original affidavit.

**3.** *Tex. Commerce Bank, N.A. v. Grizzle,* 96 S.W.3d 240, 252 (Tex.2002) ("All [summary judgment] evidence favorable to the nonmovant will be taken as true.").

consent to the mastectomy was properly obtained; and 4) any alleged act or omission of Binur was not a proximate cause of any injury or damages to Jacobo.

Jacobo appealed, arguing that the information Binur had given her "was not medically accurate" and had caused her to consent to surgery for "a disease that she did not have." She contended that because Binur "played a primary role in the preoperative, information-giving, consent obtaining portion of the surgery," he had a duty to properly inform her and obtain her informed consent. Jacobo's briefing also focused on the extent of Binur's participation as Schmidt's assistant during the mastectomy. She argued that Binur was a "co-surgeon" and therefore that he, as well as Schmidt, was required to obtain informed consent, which he had not done. At the conclusion of her brief, Jacobo suggested to the court of appeals that its holding should be as follows: "An assistant surgeon has the duty of obtaining a patient's informed consent only when the surgeon has an established doctor-patient relationship with the patient and voluntarily injects himself into the process by prescribing, recommending and/or performing the procedure."

The court of appeals concluded that although the duty to obtain a patient's informed consent does not extend to an assistant surgeon,[4] there was conflicting summary judgment evidence "about whether Dr. Binur was an operating surgeon during the mastectomy with a direct obligation to the patient or a doctor whose only role was to assist during the procedure."[5] The court of appeals also concluded that there was evidence that Binur breached a duty to obtain informed consent because "Dr. Binur essentially told [Jacobo] that there was no risk that the mastectomy was unnecessary because it was a certainty that she would develop breast cancer."[6] Therefore, the court determined that a fact question existed on whether "Dr. Binur failed to disclose the risk that the mastectomy might have been unnecessary."[7] With regard to proximate cause, the court of appeals concluded that based on Jacobo's affidavit, there was a fact question of "whether a reasonable person would have refused the mastectomy had she been accurately informed of the risk that the procedure might be unnecessary."[8]

Before we turn to the substantive issues raised by this appeal, we first address the court of appeals' decision that it would treat Binur's summary judgment motion as presenting only a motion under Rule 166a(b) and that it would disregard his "no evidence" contentions, brought under Rule 166a(i), because Binur presented summary judgment evidence.

## II

Texas Rule of Civil Procedure 166a does not prohibit a party from combining in a single motion a request for summary judgment that utilizes the procedures under either subsection (a) or (b),[9] with a request for summary judgment that utilizes subsection (i) and asserts that there is "no evidence of one or more essential elements of a claim or defense."[10]

---

4. 70 S.W.3d at 334 (citing *Weiser v. Hampton*, 445 S.W.2d 224, 230 (Tex.Civ.App.–Houston [1st Dist.] 1969, writ ref'd n.r.e.), and *Rea v. Gaulke*, 442 S.W.2d 826, 829–30 (Tex.Civ. App.–Houston [14th Dist.] 1969, writ ref'd n.r.e.)).

5. *Id.* at 336.

6. *Id.* at 337.

7. *Id.* at 338.

8. *Id.* at 339.

9. TEX.R. CIV. P. 166a(a), (b).

10. *Id.* 166a(i).

The fact that evidence may be attached to a motion that proceeds under subsection (a) or (b) does not foreclose a party from also asserting that there is no evidence with regard to a particular element. Similarly, if a motion brought solely under subsection (i) attaches evidence, that evidence should not be considered unless it creates a fact question, but such a motion should not be disregarded or treated as a motion under subsection (a) or (b). We disapprove of decisions that hold or imply that, if a party attaches evidence to a motion for summary judgment, any request for summary judgment under Rule 166a(i) will be disregarded.[11]

 Some Texas courts have declared that when a party seeks summary judgment under subsection (a) or (b), and also under subsection (i), the better practice is to file two separate motions, or at least to include headings that clearly delineate and segregate the part of a motion relying on subsection (a) or (b) from the part that relies on subsection (i).[12] We agree that using headings to clearly delineate the basis for summary judgment under subsec-

tion (a) or (b) from the basis for summary judgment under subsection (i) would be helpful to the bench and bar, but the rule does not require it. If a motion clearly sets forth its grounds and otherwise meets Rule 166a's requirements, it is sufficient.[13] Here, Binur's motion for summary judgment asserted that there was no evidence of proximate cause. The court of appeals erred in concluding that this ground could be disregarded because evidence was attached to the motion.

## III

One ground for Binur's motion for summary judgment was that the evidence affirmatively established that Jacobo's informed consent was properly obtained. The consent form, attached to the motion, says in part:

1. My doctor and consultants selected by my doctor explained my need for (DESCRIBE SURGERY/PROCE-DURE/ TREATMENT): Bilateral simple mastectomy, tissue expander PHYSICIAN'S/SURGEON'S NAME: Dr. Schmidt/Dr. Binur

**11.** *Brooks v. First Assembly of God Church of Cleburne,* 86 S.W.3d 793, 795 (Tex.App.–Waco 2002, no pet.); *Tomhave v. Oaks Psychiatric Hosp.,* 82 S.W.3d 381, 389 n. 4 (Tex.App.–Austin 2002, pet. denied); *Torres v. City of Waco,* 51 S.W.3d 814, 822 (Tex.App.–Waco 2001, no pet.); *Crow v. Rockett Special Util. Dist.,* 17 S.W.3d 320, 328 (Tex.App.–Waco 2000, pet. denied); *Grimes v. Andrews,* 997 S.W.2d 877, 880 n. 1 (Tex.App.–Waco 1999, no pet.); *Ethridge v. Hamilton County Elec. Coop. Ass'n,* 995 S.W.2d 292, 295 (Tex.App.–Waco 1999, no pet.).

**12.** *See Calp v. Tau Kappa Epsilon Fraternity,* 75 S.W.3d 641, 648 (Tex.App.–Amarillo 2002, pet. denied); *Kelly v. LIN Television of Tex., L.P.,* 27 S.W.3d 564, 569 (Tex.App.–Eastland 2000, pet. denied); *Grant v. Southwestern Elec. Power Co.,* 20 S.W.3d 764, 768 (Tex.App.–Texarkana 2000), *aff'd in part and rev'd in part,* 73 S.W.3d 211 (Tex.2002); *see also* Johnson, *The No–Evidence Motion for Summary Judgment in Texas,* 52 BAYLOR L.REV. 929, 943 (2000).

**13.** *See, e.g., Howell v. Hilton Hotels Corp.,* 84 S.W.3d 708, 711–12 (Tex.App.–Houston [1st Dist.] 2002, pet. denied); *Hanus v. Tex. Util. Co.,* 71 S.W.3d 874, 877 (Tex.App.–Fort Worth 2002, no pet.); *FNFS, Ltd. v. Sec. State Bank & Trust,* 63 S.W.3d 546, 548–50 (Tex. App.–Austin 2001, pet. denied); *Welch v. Coca–Cola Enters., Inc.,* 36 S.W.3d 532, 535–36 (Tex.App.–Tyler 2000, no pet.); *Barraza v. The Eureka Co.,* 25 S.W.3d 225, 231 (Tex. App.–El Paso 2000, pet. denied); *Whalen v. Condo. Consulting & Mgmt. Servs., Inc.,* 13 S.W.3d 444, 446–48 (Tex.App.–Corpus Christi 2000, pet. denied); *Graves v. Komet,* 982 S.W.2d 551, 553–54 (Tex.App.–San Antonio 1998, no pet.); *Morgan v. Shelton,* No. 09–99–537–CV, 2000 WL 1364355, at *1, 2000 Tex. App. LEXIS 6452, at *2 (Beaumont Sept. 21, 2000, no pet.) (not designated for publication).

based on their training and experience to diagnose or treat my condition (DESCRIBE CONDITION): Bilateral fibrocystic disease.

2. My doctor described the risks, complications and consequences of the proposed surgery/procedure/ treatment, including the possibility of infection, blood clots in veins and lungs, hemorrhage, allergic reactions and even death. My doctor discussed the alternatives available and their risks, complications and consequences, including the option of no surgery/procedure/treatment. I understand that complications may result and that no guarantee of success can be made. Unknown conditions or complications may be present, and these may require the judgment of my doctor and consultants selected by my doctor as to care to be rendered.

Binur's motion for summary judgment also attached an affidavit from Dr. Schmidt. It said, in part:

On or about November 30, 1992, I first saw Donna Jacobo as a patient. Ms. Jacobo was referred to me by her primary care physician, Dr. Jimenez. After speaking with Ms. Jacobo, taking a history, performing a physical examination, and reviewing Ms. Jacobo's mammogram, I recommended that Ms. Jacobo have a bilateral prophylactic mastectomy as a preventative measure to avoid the development of breast cancer based on Ms. Jacobo's high risk for developing breast cancer. I discussed with Ms. Jacobo the risks, benefits, complications, and alternatives to the mastectomy procedure during that visit. I asked Ms. Jacobo to return in three months and encouraged her to see a plastic surgeon to discuss possible reconstruction in the event that she decided to undergo the mastectomy procedure.

I next saw Ms. Jacobo on March 1, 1993. At that visit, a decision was made jointly between me and Ms. Jacobo that she would undergo the bilateral prophylactic mastectomy. I again discussed with Ms. Jacobo the risks, benefits, complications, and alternatives to the mastectomy procedure. Ms. Jacobo was given an opportunity to ask questions. Ms. Jacobo made the decision to undergo the bilateral prophylactic mastectomy.

\* \* \*

The March 17, 1983 bilateral prophylactic mastectomy procedure was an appropriate medical procedure under the circumstances, and the decision to undergo the procedure was made by Ms. Jacobo after receiving proper informed consent from me.

The consent form and Schmidts affidavit were evidence that Jacobo's consent to the mastectomy was informed, and they constituted evidence that "could have been readily controverted" within the meaning of Rule 166a(c).[14] Binur was entitled to summary judgment unless Jacobo raised an issue of fact.[15]

Jacobo's response to Binur's motion for summary judgment included her own affidavit, from which we quote at length because it is central to her claim:

I was seen for the first time by Dr. Binur in December of 1992. I gave him essentially the same history I had given Dr. Schmidt. I informed him that Dr. Schmidt recommended that I undergo a subcutaneous prophylactic mastectomy. Dr. Binur told me that this procedure would not remove all of my breast tissue, and that the proper procedure

---

**14.** TEX.R. CIV. P. 166a(c). **15.** *Id.*

would be to have a "simple" or "total" mastectomy, as all breast tissue would then be removed. He told me that he would talk to Dr. Schmidt about this.

When I questioned Dr. Binur about my risk of developing breast cancer, he told me that it wasn't a question of *if* I required it, but more of a question of *when* it would happen. Essentially, he told me that it was a certainty that I would develop the disease. He also told me that he and Dr. Schmidt would do the mastectomy and that he would place tissue expanders into my chest to begin the reconstructive phase of the procedure.

Because of the information that was given to me by Dr. Binur—that breast cancer was a certainty—I consented to the procedure.

\* \* \*

I consented to have my breasts removed from my body because Dr. Binur convinced me that if I didn't, I would die from breast cancer. He told me that he and Dr. Schmidt would do the mastectomy together and that he [Dr. Binur] would do the reconstructive surgery.[16]

Jacobo's response to Binur's motion for summary judgment also quoted testimony that she says corroborates her affidavit. Jacobo recounted that Dr. Schmidt had testified during trial that Binur saved Jacobo's life, and that when cross-examined by Jacobo's counsel, Schmidt had said:

Q. Okay. How did Dr. Binur save Donna's life?

A. I have said before that I don't try to scare people into surgery. If ever a woman needed surgery for bilateral mastectomies to prevent breast cancer, this is the woman that needed it. In my opinion she needed it desperately.

But I'm not the one that talked her into it. I'm not the one that said—that pushed her into plastic surgery and said you have to have surgery. I sent her to a plastic surgeon to discuss it with her and so she could make her own decision with informed consent about what she wanted done.

She came back to me and, as I recall, was very—extremely receptive to the idea even—very much wanting the mastectomies done. I assume that Dr. Binur discussed it with her at length and discussed the risks of cancer with her, as I had done, and that in discussing it with her he had also discussed the reconstructive aspect of surgery.

So, in answering your question, I think that his—my opinion, his opinion, the information that *we* gave Ms. Jacobo resulted in her deciding to go ahead with the surgery, and that's what saved her life.[17]

Thus, the question to be answered is whether the evidence raised a fact question regarding informed consent. A claim by a patient that a health care provider failed to obtain informed consent to medical care or a surgical procedure is governed by section 6.02 of former article 4590i.[18] While this case was pending on appeal, the Legislature amended parts of article 4590i and recodified it in 2003 as chapter 74 of the Texas Civil Practice and Remedies Code.[19] Former section 6.02 is now section 74.101 of that Code.[20] Because

---

16. Emphasis in original.

17. Emphasis in Jacobo's response.

18. Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2048 (as amended) (former TEX.REV.CIV. STAT. art. 4590i, § 6.02), *repealed by* Act of June 2,

2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

19. Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847.

20. TEX. CIV. PRAC. & REM.CODE § 74.101.

former section 6.02 continues to govern this case, and the court of appeals' opinion as well as the parties' briefing cite it, we will cite to that section rather than its recodification.

Former section 6.02 says:

In a suit against a physician or health care provider involving a health care liability claim that is based on the failure of the physician or health care provider to describe or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.[21]

The court of appeals correctly noted that the Medical Liability and Insurance Improvement Act, embodied in former article 4590i, created the Texas Disclosure Panel to promulgate a list, known as List A, that identifies procedures for which some disclosure is required and the risks or hazards of those procedures.[22] If a health care provider discloses the risks or hazards identified in List A for a procedure,

there is a rebuttable presumption that the health care provider was not negligent in obtaining informed consent.[23] Conversely, failure to disclose the risks or hazards identified in List A for a particular procedure will create a rebuttable presumption that the health care provider was negligent in failing to disclose those risks or hazards.[24]

A simple mastectomy, which was the procedure performed on Jacobo, is expressly excluded from List A.[25] Former section 6.07(b) provides that when the Texas Disclosure Panel has not made a determination regarding disclosure of risks attendant to a particular procedure, the health care provider has the "duty otherwise imposed by law." [26] This Court has held that the " 'duty otherwise imposed by law' " is the duty imposed by former section 6.02, which is " 'to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.' " [27]

We explained in *Barclay v. Campbell* that when "no presumption has been established by the Act, the plaintiff must prove by expert testimony that the medical condition complained of is a risk inherent in the medical procedure performed." [28]

---

**21.** Former TEX.REV.CIV. STAT. art. 4590i, § 6.02.

**22.** *Id.* §§ 6.03, 6.04.

**23.** *Id.* § 6.07; *see also Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex.1983).

**24.** Former TEX.REV.CIV. STAT. art. 4590i, § 6.07; *Peterson,* 652 S.W.2d at 931.

**25.** List A excludes a simple mastectomy:

(i) Integumentary system treatments and procedures.
(1) Radical or modified radical mastectomy. (Simple mastectomy excluded).
(A) Limitation of movement of shoulder and arm.
(B) Swelling of the arm.

(C) Loss of the skin of the chest requiring skin graft.
(D) Recurrence of malignancy, if present.
(E) Decreased sensation or numbness of the inner aspect of the arm and chest wall.
TEX. ADMIN. CODE § 601.2(i)(1).

**26.** Former TEX.REV.CIV. STAT. art. 4590i, § 6.07 ("If medical care or surgical procedure is rendered with respect to which the panel has made no determination either way regarding a duty of disclosure, the physician or health care provider is under the duty otherwise imposed by law.").

**27.** *Barclay v. Campbell,* 704 S.W.2d 8, 9 (Tex. 1986) (quoting *Peterson,* 652 S.W.2d at 931).

**28.** *Id.*

In that case, a drug that could cause severe adverse side effects in a relatively few individuals was administered to the plaintiff, and he developed those side effects. We explained that "inherent," in the context of informed consent, "means that the risk is one which exists in and is inseparable from the drug itself." [29] We held that there was a fact question of whether a reasonable person could have been influenced by the failure to disclose the side effects of the drug in making the decision to give consent to take it. [30]

■ However, failing to disclose that a *diagnosis or prognosis may be or is erroneous* when that diagnosis or prognosis supports a recommendation to undergo a surgical procedure is not a risk that is "inherent to" and "inseparable from" [31] the surgical procedure itself. In the case before us today, Jacobo attempts to expand the "risks or hazards" beyond those inherent in particular medical care or a surgical procedure. Applying Jacobo's view of informed consent would mean that the physician in *Barclay* could have been liable even if he had disclosed the possible side effects of the drug if the physician had erroneously concluded that the drug was a proper medication for the patient's condition. But the intent and reach of former section 6.02 do not extend that far. This can be seen by looking at the types of risks that have been enumerated by the Texas Disclosure Panel in List A. For example, although a "simple mastectomy" is expressly excluded from List A, "Radi-

cal or modified radical mastectomy" is included. The risks enumerated are these:

(A) Limitation of movement of shoulder and arm.

(B) Swelling of the arm.

(C) Loss of the skin of the chest requiring skin graft.

(D) Recurrence of malignancy, *if* present.

(E) Decreased sensation or numbness of the inner aspect of the arm and chest wall. [32]

None of the risks listed for this or any other procedure on List A include the risk that the physician's diagnosis or prognosis that supports his or her recommendation that the procedure be performed is or may be incorrect. If a physician told a patient that she had cancer and was therefore recommending a hysterectomy, the risks enumerated by the Texas Disclosure Panel do not include the risk that the surgery may be unnecessary. [33] The risk that a physician may have erroneously made a diagnosis or prognosis as a predicate to recommending surgery is not *inherent* in any particular surgery or procedure or medication. That is a general risk of consulting a physician.

■ At least four courts of appeals have correctly discerned that if a physician recommends an unnecessary surgery, there may be liability for negligence in making an erroneous diagnosis or prognosis, but there can be no claim for lack of informed consent. In *Marling v. Maillard,* the phy-

**29.** *Id.* at 10.

**30.** *Id.*

**31.** *Id.*

**32.** TEX. ADMIN. CODE § 601.2(i).

**33.** The risks for a vaginal hysterectomy are:

(A) Uncontrollable leakage of urine.

(B) Injury to bladder.
(C) Sterility.
(D) Injury to the tube (ureter) between the kidney and the bladder.
(E) Injury to the bowel and/or intestinal obstruction.
(F) Completion of operation by abdominal incision.

*Id.* § 601.2(g)(2). The risks listed for an abdominal hysterectomy are similar. *Id.* § 601.2(g)(1).

sician told the patient that there was a serious risk that cancer had spread from her face to the lymph nodes in her neck, based in part on the fact that there was considerable swelling in her neck.[34] She consented to surgery, and the physician removed twenty lymph nodes, resulting in scarring, nerve problems, and disfigurement.[35] A pathological examination of the removed nodes revealed no cancer, only an infection. The patient alleged that her physician "failed to inform her that her neck swelling was caused by a dental infection and that diagnostic or treatment options other than a modified radical neck dissection were available." [36] The court of appeals held that this misdiagnosis could not support a cause of action for lack of informed consent:

> Appellant would have us hold a physician who negligently misdiagnoses a patient liable for also not informing the patient of what later turns out to be the "correct" diagnosis. To so hold would subject the physician who is unaware of, or mistaken as to, the "correct" diagnosis to additional liability for not informing the patient of all possibly "correct" diagnoses. The Act does not provide for such liability. Misdiagnosis or mistreatment may constitute negligence but it does not constitute a cause of action based upon the theory of informed consent.[37]

In *Crundwell v. Becker*, a physician allegedly told a patient she had cancer and recommended a hysterectomy.[38] She consented to that surgery. When it was de-termined she did not have cancer, she sued, alleging fraud, negligent misrepresentation, and lack of informed consent. The court of appeals held that the trial court properly granted a directed verdict on the informed consent cause of action, reasoning: "The issue of whether she would have agreed to the surgery had she not believed she had cancer is distinct from the issue of whether she was fully informed of the risks attendant to having surgery." [39]

Similarly, the court of appeals in *Patton v. St. Joseph's Hospital* held that "misdiagnosis and mistreatment might constitute negligence," but "it does not constitute lack of informed consent." [40] In that case, the patient alleged that a physician and hospital misdiagnosed the cause of her abdominal pain and vaginal swelling and thus recommended unnecessary surgery. In *Power v. Kelley,* an elderly woman underwent heart surgery and shortly thereafter, eye surgery.[41] About six months later, she died of lung cancer. Her survivors sued the two surgeons who had operated, alleging that if the surgeons had told the decedent that she had terminal lung cancer, she would not have consented to the surgeries. The survivors contended that, had the surgeons examined pre- or post-operative x-rays, the malignant mass in the patient's lung would have been identified as terminal cancer. The court of appeals rejected this theory of liability, holding, "a complaint that a physician performed an unnecessary surgery can form the basis of

---

34. 826 S.W.2d 735, 737 (Tex.App.–Houston [14th Dist.] 1992, no writ).

35. *Id.*

36. *Id.* at 738.

37. *Id.*

38. 981 S.W.2d 880, 882 (Tex.App.–Houston [1st Dist.] 1998, pet. denied).

39. *Id.* at 884.

40. 887 S.W.2d 233, 247 (Tex.App.–Fort Worth 1994, writ denied).

41. 70 S.W.3d 137, 139 (Tex.App.–San Antonio 2001, pet. denied).

a cause of action for medical negligence but not a claim relating to informed consent."[42]

In the case before us, the court of appeals cited the *Patton* decision, but rejected its reasoning.[43] Contrary to *Patton* and the other decisions cited above, the court of appeals held that there was "a fact issue about whether Dr. Binur failed to disclose the risk that the mastectomy might have been unnecessary, and thus, whether such failure 'could have influenced a reasonable person in making a decision to give or withhold consent.'"[44] For the reasons considered above, this holding was erroneous.

There is evidence that Binur told Jacobo that she would certainly develop breast cancer, and there is evidence that this was not a correct assessment. Dr. Binur conceded that it "would not be accurate" to state that "her chance would be a hundred percent" for developing breast cancer, and then, in response to the question, "It wouldn't be proper to say that to a patient like Donna under these circumstances, would it?", Binur said, "No." We accept this evidence as true, as we must.[45] But Binur's erroneous diagnosis or prognosis is not a risk that is inherent in the surgical procedure that Jacobo underwent. It is a diagnosis or prognosis that may be actionable negligence, but it cannot form the basis for a finding that Binur failed to obtain informed consent from Jacobo.

█ Binur offered evidence that Jacobo signed a consent form that identified the surgery for which she was giving consent. She unquestionably knew that her breasts were to be removed, and she does not allege that the mastectomy or the reconstruction was performed in a negligent manner. Jacobo did not present or point to any evidence that there were risks inherent in the surgical procedures themselves about which Binur failed to advise her. Accordingly, the trial court properly granted summary judgment.

\* \* \* \* \* \*

We hold that the trial court did not err in granting summary judgment. We therefore reverse the judgment of the court of appeals and render judgment for Binur. We do not reach or consider any of the court of appeals' determinations regarding assisting and "operating" surgeons or the duty to obtain informed consent because of our disposition of other issues raised by the parties.

---

**42.** *Id.* The court of appeals also held, "A complaint that a physician performed a surgery that he should not have performed or should have performed differently if he had done preoperative testing required by the applicable standard of care is a negligence issue, not an informed consent issue." *Id.*

**43.** 70 S.W.3d at 338 n. 6 (citing *Patton*, 887 S.W.2d at 247).

**44.** *Id.* (quoting former TEX.REV.CIV. STAT. art. 4590i, § 6.02).

**45.** *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 252 (Tex.2002).