Donna **ARDOIN**, Individually and As Legal Representative of the Estate of Floyd Ardoin, Deceased, Appellant

v.

**ANHEUSER–BUSCH, INCORPORATED,** Appellee.

No. 14–07–00210–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 28, 2008.

**500**

Richard L. Lagarde, Houston, TX, for appellants.

Richard C. Danysh, San Antonio, TX, for appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

In this appeal from the trial court's grant of the defendant employer's motion for no-evidence summary judgment in a gross-negligence lawsuit, the deceased worker's spouse and estate contend there is more than a scintilla of evidence that the employer was consciously indifferent to a known extreme risk. Because we conclude the summary-judgment evidence does not raise a question of material fact regarding the employer's awareness or indifference to a risk that would expose its employees to the danger at issue, we will affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

Floyd Ardoin ("Floyd") worked as a "palletizer tender" for Anheuser–Busch, Inc. ("Anheuser–Busch" or "the company") at its Houston brewery. A "palletizer" is a piece of industrial equipment used in packaging cans onto pallets and encasing the packages in shrink-wrap. At the time of these events, there were approximately fifteen palletizers at the Anheuser–Busch Houston facility. One was manufactured by Wyard and had been placed in service in 1994; the remainder were manufactured by Alvay. Because an understanding of the relevant facts requires some knowledge of the Wyard palletizer's operation, we summarize the pertinent testimony of Anheuser–Busch mechanics Ed Fischer, Ed May, and Glenn Miller below.

### A. Wyard Palletizer Operation

The back of the palletizer is on a higher level than the front. A catwalk runs along the bank of palletizers at the upper level, and a control panel for the Wyard palletizer is located there. The control panel contains a switch for restarting the palletizer and colored lights to indicate problems or jams.

Pallets enter the palletizer on the upper level and are dispensed from the lower

---

**1.** The facts summarized below are drawn from the evidence produced by Ardoin in re-sponse to Anheuser–Busch's motion for no-evidence summary judgment.

level at the front of the machine. First, empty pallets are placed on a chain that conveys them to the accumulation area at the back of the palletizer on the upper level. Rollers then move the pallets into a stack in the magazine. On the lower, front side of the palletizer, a carriage pushes retractable forks toward the magazine. Hydraulic power moves the forks vertically, but their forward motion is powered by a pneumatic ram. The area of the palletizer occupied by the moving forks is identified in the record as the "dispensing" or "magazine area" of the palletizer. The forks lift the stack of pallets, leaving the bottom pallet on a conveyor chain. The chain then carries the bottom pallet "downstream" to a "hoist" area to receive cases of beer.

The Wyard palletizer can be operated automatically or manually. When it is operating automatically, an electric photo eye in or near the machine projects a beam of light. When the beam of light is broken, the photo eye sends an output signal to the palletizer solenoids, which then allow pressurized air to drive the fork carriage forward. Electric power to the palletizer and the photo eyes can be turned off by pushing one of the "e-stop" buttons at the lower level. If an e-stop button is pressed before the photo eye has been activated, the photo eye is turned off and does not send a signal to the solenoids to move the forks forward. If the forks have already moved forward, however, pressing an e-stop button will not release the pneumatic pressure that drives the forks. The air pressure can be released by turning a valve and disconnecting a hose, or by pressing a recessed part of a solenoid using a pencil point or a "punch." The forks also can be retracted when the palletizer is switched to manual operation.

Workers called "palletizer tenders" are employed to clear pallet jams. To clear a jam, the tender could switch the palletizer to manual operation and retract the forks. Alternatively, the tender could push an e-stop button and remove the jammed pallet while standing on the lower level or the catwalk and using one of the hooks provided by the company. The tender also could call a mechanic to release the air pressure holding a jammed pallet against the magazine or between the forks.

## B. The Accident

On October 24, 2004, Floyd attempted to clear a pallet jam from the Wyard palletizer. He did not switch the machine to manual operation and retract the forks, access the jam from the back of the machine, or push an e-stop button to turn off electricity to the palletizer. Instead, he left the machine operating in its automatic mode, crawled through a small space under the side of the palletizer, and stood up inside the magazine area.

Joe Rodriguez was also working as a palletizer tender that day. From the control panel on the upper level, he saw that the Wyard palletizer displayed an amber light, which indicated that it was "calling for a pallet." Rodriguez descended halfway down the catwalk stairs and saw Floyd near the palletizer. Rodriguez believed that Floyd was clearing the jam, so he attended to problems at two other palletizers before he returned to the upper level. When he saw that the Wyard palletizer still displayed an amber light, Rodriguez went downstairs to investigate.

On the lower level, Rodriguez initially could not see Floyd, but twice heard him call, "Joe." When Rodriguez found him, Floyd was unconscious and trapped inside the Wyard palletizer. Floyd was holding a pallet against his chest, and the carriage that drives the forks held him pinned against the frame of the magazine.

Rodriguez immediately hit the e-stop button. This button turned off the electricity to the machine but did not release the carriage, which was held in place by air pressure. Rodriguez went to the upper level and told Deborah Hunt, a member of Anheuser–Busch's emergency response team, that Floyd was badly hurt. He also told mechanic Glenn Miller to release the air pressure from the Wyard palletizer. After Miller released the air pressure from the pneumatic ram by turning a valve and disconnecting a hose, employees were able to move the carriage away from Floyd. By that time, however, Floyd had suffocated.

Ardoin's widow, Donna Ardoin, and his estate (collectively, "Ardoin") sued Anheuser–Busch for gross negligence and sought exemplary damages. The company moved for summary judgment on the grounds that there is no evidence it was subjectively aware of an extreme risk to Floyd or was consciously indifferent to his safety. The trial court granted the motion, and Ardoin brought this appeal.

## II. ISSUE PRESENTED

In a single issue, Ardoin contends the trial court erred in granting Anheuser–Busch's motion for no-evidence summary judgment on the gross-negligence claim.

## III. STANDARD OF REVIEW

In reviewing the trial court's grant of a motion for no-evidence summary judgment, we examine the record in the light most favorable to the nonmovant; if the nonmovant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper. TEX.R. CIV. P. 166a(i); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex.2003); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003). The evidence is sufficient if it would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch*, 118 S.W.3d at 751 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). On the other hand, evidence is insufficient to defeat a motion for no-evidence summary judgment if it does no more than create a mere surmise or suspicion that a challenged material fact exists. *Id.* at 751 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). Evidence that is so slight as to make any inference a guess is the legal equivalent of no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We consider the movant's evidence only if it creates a question of material fact. *See Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex.2004). *See also City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex.2005) (noting that, when reviewing a motion for no-evidence summary judgment, the appellate court's review of the evidence "will effectively be restricted to the evidence contrary to the motion").

## IV. ANALYSIS

### A. Statutory Gross Negligence

■ Although workers' compensation benefits are ordinarily the exclusive remedy against an employer for an employee's work-related death, the deceased worker's legal beneficiaries may recover exemplary damages if the employer's gross negligence caused the worker's death. TEX. LAB.CODE ANN. § 408.001 (Vernon 2006); TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a) (Vernon 2008) (permitting recovery of exemplary damages if the claimant proves that fraud, malice, or gross negligence caused the harm at issue). Gross negligence is statutorily defined as an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence in-

volves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(11). To constitute gross negligence, the employer's act or omission must satisfy both the objective and subjective elements. *Id.; Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 21–22 (Tex.1994). Objectively, the employer's conduct must involve "an *extreme* degree of risk." TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(11) (emphasis added). This element is satisfied only if the employer's act or omission is likely to cause serious injury. *See Moriel,* 879 S.W.2d at 22. To fulfill the subjective element, a claimant must show that the employer demonstrated conscious indifference despite its "actual awareness of the extreme risk created by [its] conduct." *Id.* (citing *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993)).

█ Although these requirements may be met through direct or circumstantial evidence, *see id.,* they are not satisfied through proof of ordinary negligence or even bad faith. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(b); *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex. 2001). As the Texas Supreme Court repeatedly has emphasized, "what separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *Diamond Shamrock Ref. Co. v. Hall,* 168 S.W.3d 164, 173 (Tex.2005) (quoting *La.–Pac. Corp. v. Andrade,* 19 S.W.3d

245, 246–47 (Tex.1999)). Thus, conduct that is "merely thoughtless, careless, or not inordinately risky" is not grossly negligent. *Moriel,* 879 S.W.2d at 22.

In Ardoin's live pleading at the time of summary judgment, Ardoin alleged that Anheuser–Busch was grossly negligent because it failed to equip the Wyard palletizer with "guards such as interlock gates or electric eyes around it to prevent employees from coming in contact with moving equipment while the equipment was energized." On appeal, Ardoin does not dispute that Anheuser–Busch provided training and had safety policies and measures in place that would have prevented the accident if Floyd had followed them. *See Andrade,* 19 S.W.3d at 247 ("Corporate safety policies, or the lack of them, can serve as the basis for a gross negligence finding."); *see also Diamond Shamrock,* 168 S.W.3d at 171–72 (failure to implement redundant safety systems held to be no evidence of conscious indifference); *Agrium U.S., Inc. v. Clark,* 179 S.W.3d 765, 767 (Tex.App.–Amarillo 2005, pet. denied) ("An actor's failure to pursue the safest course available or provide the best warnings imaginable does not necessarily equate to a want of caring." (citing *Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 597–98 (Tex.1999))). Instead, Ardoin argues that Anheuser–Busch was consciously indifferent to the risk that workers would take actions contrary to their training, whether intentionally or inadvertently.

Through its motion for summary judgment, Anheuser–Busch challenged only the subjective components of gross negligence, and asserted there was no evidence it knew of the risk at issue or was consciously indifferent to the risk posed to its employees. Thus, we review the summary-judgment record for evidence that Anheuser–Busch was subjectively aware that, in the absence of guards, employees might

enter the dispensing area of the palletizer while it was activated, such that the company's failure to provide guards to prevent entry "demonstrate[s] that it did not care about the consequences to [Floyd] of a known extreme risk of danger." *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 232 (Tex.2004).

## B. Imputing Gross Negligence to a Corporation

 Because a corporation can act only through individuals, we distinguish between acts that are directly attributable to the corporation and acts that are solely attributable to its agents or employees. *See Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998). A corporation is grossly negligent if it authorizes or ratifies an agent's gross negligence, or if it is directly negligent in hiring an unfit agent. *Id.* A corporation also may be grossly negligent through the acts or omissions of a vice-principal. *Id.* at 922. Such vice-principals include corporate officers; those who have authority to employ, direct, and discharge other employees; those engaged in performing the corporation's nondelegable or absolute duties; and those responsible for the management of the whole or a department or a division of the business. *Id.* In determining whether acts are directly attributable to the corporate employer, we do not restrict our review to individual elements or facts but instead consider all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent. *Id.* These facts and circumstances include reasonable inferences that can be drawn from the corporation's acts or omissions. *Id.*

## C. Knowledge that Workers Forget or "Cut Corners"

On appeal, Ardoin contends she produced sufficient evidence that Anheuser– Busch knew its employees "would, on occasion, either forget or choose not to press the E-stop prior to entering a palletizer to clear a jam." In support of this argument, Ardoin cites summary-judgment evidence that demonstrates the company's awareness that employees sometimes disregarded or failed to follow correct procedures. For example, Dale Pendleton, Senior Director of Environmental Health, Safety, and Security ("EHS & S") for the company, testified, "It's possible as human beings that we forget procedures. And we forget—human beings forget to take—forget all kinds of things and forget to take proper precautions that they've been trained to take." Philip Jost, Resident EHS & S Manager for the company's Houston facility, testified that palletizer tenders are trained in clearing pallets because it "could be a hazard to the employee should they do it incorrectly...." Supervisor Bernard Montgomery acknowledged that "sometimes employees will take short cuts," and employee Jimmy Osborn agreed that workers sometimes "cut corners." This generalized testimony, however, is not evidence that Anheuser–Busch was subjectively aware that employees would not only fail to use e-stops, but were likely to enter the dispensing area of the palletizer while it remained in automatic operation.

Ardoin also points to summary-judgment evidence that employees actually entered the palletizer to clear jams. Employee Harrol Williams testified that workers of smaller stature, including Floyd Ardoin, had to enter the machine to reach a jam; however, Williams did not specify whether these workers used the e-stops, manually retracted the forks, asked mechanics to release the air pressure before entering, or entered the back of the palletizer, away from moving parts. This is significant because there is evidence

that some tenders entered the magazine from the higher level at the back of the palletizer (as distinguished from the dispensing area in front of the magazine), but there is no evidence that this procedure exposed workers to extreme risk. Thus, evidence of such entry, such as the following testimony of Bernard Montgomery, the company's Group Manager Supervisor, does not support Ardoin's position as alleged:

Q: Were you always able to get the pallets out using a hook, or did you sometimes have to actually get into the machinery and pull a pallet out?

A: Actually had to get into the machine.

Q: All right. And on those occasions when you actually had to get in the machinery, *I take it you hit the E-stop button?*

A: *Correct.*

Q: And once you hit the E-stop button, according to the training you received, it was your understanding that those forks were not going to move any more, correct?

A: That's not correct. That's not what I said.

Q: All right.

A: *Based on my training, hit the E-stop, clear the jams from the back side of the palletizer, where you're not exposed to any moving—any moving forks or anything in front.*

(Emphasis added).[2] Unlike Floyd, Montgomery used the e-stop button and cleared jams without exposing himself to the moving forks. Moreover, Montgomery subsequently testified that he had never seen

anyone access the palletizer from the side as Floyd did.

Ardoin produced similar testimony from production operator Courtney Armstead. Armstead agreed that to clear a jam on the Wyard palletizer, "you would put the machine in manual, lower the pallet forks, back them out of position, reverse the operation of the chain so that it pulls the stack out of position, and then you get *into the back side* of the machine and pull the pallet out ...." (emphasis added). Armstead further testified that he has never had to clear a jam from the magazine area of the Wyard palletizer.

Although such testimony demonstrates that workers sometimes entered the magazine itself through the back of the palletizer, it is not evidence that Anheuser–Busch was aware that guards were necessary to prevent employees from entering the dispensing area in front of the magazine while the machine was operating.[3] Regarding entry into the dispensing area, Ardoin's strongest evidence concerns the practices and experience of Floyd's supervisor Ruben Gonzalez and mechanics Ed Fischer and Ed May. For the reasons discussed below, however, their testimony presents less than a scintilla of evidence that Anheuser–Bush was subjectively aware that the absence of guards on the sides of the Wyard palletizer presented an extreme risk.

### D. Testimony Concerning Supervisor Ruben Gonzalez

According to Debra Hunt, supervisor Ruben Gonzalez told her after Floyd's death that employees could hear a sound that warned them the forks of the Wyard

---

**2.** Montgomery further testified that he was trained "[t]o kill all the power source to the machine before entering it."

**3.** We disregard evidence unfavorable to Ardoin, including testimony from other employees denying knowledge that the dispensing area was accessible, or denying that they would enter that area of the palletizer.

palletizer were preparing to move forward. Hunt testified, "I was told that it was common knowledge there [were] lots of jams in that area, and they had three seconds—and I'm thinking I remember three seconds from the time you heard the 'sssshhhh,' release of the forks, to get out." She further stated, "I don't know if it was the forks activat[ing]. But that's what I understood, that it was multiple jams [sic] and they had three seconds from the time of the shush they heard, to get out of harm's—I guess, I'm assuming, I guess I'm saying get out of harm's way."

Gonzalez testified that he had seen mechanics in the area between the forks and the magazine on more than one occasion, but the mechanics used the e-stop and were "below the chains and everything else." Gonzalez further testified that several times he had crawled into the area where he had seen the mechanics working, and he did not always use the e-stop on these occasions. According to Gonzalez, he remained on his hands and knees because "[o]therwise I would be inside the machine, if I stood up. As long as I'm underneath the machine, I know the machine can't crush me or do anything to me."

Ardoin argues that Gonzalez had knowledge of the extreme risk to anyone who stood inside the machine while it was activated, and contends that Gonzalez was consciously indifferent to Floyd's safety because he breached his duty as a warehouse supervisor to warn Floyd of this risk.[4] According to Ardoin, Gonzalez's indifference to Floyd's safety is attributable to Anheuser–Busch.

■ This argument is unpersuasive for several reasons. First, Gonzalez described his duties as a warehouse supervisor as "truck dock manager or palletizer foreman," but Ardoin offered no evidence that his actions were authorized or ratified by Anheuser–Busch or that the company was otherwise aware of his actions. In the absence of such evidence, the acts of a lower-level employee such as a foreman are not attributable to the corporation. *See Qwest Int'l Commc'ns, Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex.2005) (per curiam). In addition, Gonzalez testified that he was identifying his own practices. He stated, "Anheuser–Busch's rule may be different. But I was always told that if you enter the machine, you hit the e-stop. I do not consider entering the machine being underneath it." Despite his narrow interpretation of what it means to "enter the machine," Gonzalez testified that Anheuser–Busch trains its employees to use the e-stops, to remove the pallets from the magazine at the back of the machine, and to use a hook to clear the jam while standing inside the magazine itself rather than standing in the dispensing area between the magazine and the forks. Finally, Gonzalez testified that no one saw him crawl below the chains in the dispensing area of the palletizer, and he told no one of this practice; thus, there is no evidence that the corporation was aware that employees might interpret the rules in a manner that permitted entry into the dispensing area while the machine was operating.[5]

### E. Mechanics Ed Fischer and Ed May

Mechanic Ed Fischer testified that, like Floyd Ardoin, he actually stood inside the

---

4. There is no evidence that Gonzalez was responsible for training palletizer tenders, and co-worker Norma Perez testified that Floyd was trained by Dan LaBeaux or Mike Smith.

5. At best, Gonzalez's testimony illustrates his own failure to recognize the risk to which he exposed himself. Moreover, Ardoin alleged that Anheuser–Busch was grossly negligent because it failed to install available guards, not because it failed to warn.

Wyard palletizer on one occasion in 1996 without first pushing an e-stop:

> [T]he machine had stopped because there was no pallet on the hoist. And it's signalling [sic], "I don't have a pallet on the hoist." So I went down and I saw that the pallet was dislodged on the chains. But I also knew when I went under there, I was taking a very severe risk.
>
> I had an exit plan. If I broke the eyes and those forks started to come forward, then I would duck down out of the way.

Fischer agreed that the palletizer produces a "shoosh" noise three to five seconds before the forks move forward. In this instance, Fischer moved out of the way in time to avoid injury, and he never performed the maneuver again. He did not report the incident to any supervisors, managers, or even palletizer tenders.

In 2000, the forks of the Wyard palletizer had "jumped the track," and Fischer and fellow mechanic Ed May arrived to repair it. May pressed the e-stop button on his side of the palletizer, then began to climb over a hydraulic tank next to the palletizer to access the area between the forks and the magazine. When Fischer saw May climbing over the tank, Fischer stopped May and told him of his "near-miss" four years earlier. May reassured Fischer that he had used the e-stop; nevertheless, he did not enter the palletizer.[6] May had not seen or heard of anyone else entering the machine as Fischer did.

Although Fischer was aware of the risk of standing in the dispensing area without pushing an e-stop and shared his knowledge with May, there is no evidence that either mechanic alerted an Anheuser–Busch manager or supervisor that an employee might engage in such conduct. Thus, their testimony is not evidence that Anheuser–Busch was subjectively aware that employees might do so. *See id.*

### F. Insufficiency of Remaining Evidence

The remaining evidence presents less than a scintilla of evidence that Anheuser–Busch had "subjective awareness of the risk involved" in its failure to install additional guards. Palletizer tender Norma Perez testified that she was injured near the "hoist" area of the palletizer when she failed to use an e-stop, but her injury was caused by falling pallets, not by the machinery's moving parts. She did not enter the palletizer, and there is no evidence that the company's failure to install guards played any role in that accident.

Ardoin also cites evidence that Anheuser–Busch had knowledge of the availability of barriers, fences, electric eyes, gates, and other such safety devices, and that it was technologically and economically feasible to install such devices on the Wyard palletizer before Floyd's death. The relevant inquiry, however, is not whether there is evidence that the company knew of additional available means to prevent death or serious injury. *See Agrium*, 179 S.W.3d at 769 (reversing finding of gross negligence although it was "beyond doubt that other measures could have been taken by all involved to prevent the incident or reduce the risk involved"). Instead, we ask whether there is more than a scintilla of evidence that the company was subjectively aware of the risk involved

---

6. Ardoin also cites conflicting testimony that the forks of the Wyard palletizer might move forward even if the e-stop had been pressed. Such evidence does not support Ardoin's contention that the company disregarded the risk posed to employees who entered the palletizer *without* pressing the e-stop. Moreover, Ardoin does not allege that Floyd pressed an e-stop, and offers no evidence that he did so.

with its act or omission. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.001(11)(B).

The summary-judgment evidence does not raise a question of material fact regarding Anheuser–Busch's awareness or indifference to a risk that palletizer tenders would expose themselves to the danger of being pressed between the magazine and the forks or carriage of the palletizer. The Wyard palletizer had been in use for ten years, and Ardoin produced no evidence that the company's existing safety measures had previously failed to protect employees against this particular risk. *See Diamond Shamrock,* 168 S.W.3d at 172 (holding that failure to implement redundant safety systems is no evidence of conscious indifference to the risk of explosion where a check valve appeared to have protected against that risk for fifteen years). And despite Ardoin's suggestions to the contrary, Floyd did not simply fail to use the e-stop; he also avoided the company's multiple safety precautions. He did not use a hook to clear the jam from the outside or access the palletizer from the back, away from moving parts. He did not switch the palletizer into manual operation and retract the forks, and he did not call a mechanic to release the air pressure from the palletizer. Instead, he left the machine running in its "automatic" mode, crawled under its side, and stood up in the area of the machine where the forks are driven into the stacked pallets by a pneumatic ram. Ardoin produced no more than a scintilla of direct or circumstantial evidence that Anheuser–Busch had actual, subjective knowledge that a palletizer tender would engage in such conduct. We therefore overrule the sole issue presented on appeal.

## V. Conclusion

Construing the summary-judgment evidence in Ardoin's favor, we conclude that it constitutes less than a scintilla of evidence that Anheuser–Busch had actual, subjective knowledge of the risk at issue or acted with conscious indifference to that risk. We therefore overrule Ardoin's sole issue on appeal and affirm the judgment of the trial court.