NO. 07-10-0197-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JANUARY 27, 2011
_____

BROCK LOVETT, D.C.,

Appellant

v.

AARON FELTON,

Appellee
_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 96,370-E; HONORABLE DOUGLAS WOODBURN, PRESIDING
_____

*Opinion*
_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Brock Lovett, D.C. (Lovett), appeals from a judgment entered against him for personal injuries suffered by Aaron Felton (Felton), which injuries were allegedly caused by chiropractic manipulation. Lovett poses five issues for our review. We need only address that which involves whether he had a duty to inform Felton of the chance of suffering a dissected vertebral artery from a cervical spine manipulation. We reverse and render judgment.

*Background*

Felton, a twenty-nine-year-old carpet layer, experienced neck pain and headaches radiating into his eye after heavy lifting at work. He consulted Lovett on February 21, 22, and 23, 2006. In the first two sessions, Lovett performed a manipulation of Felton's neck without providing relief. In the third session, Lovett performed a more forceful manipulation resulting in a release of the joint, but Felton immediately began experiencing blurred vision, nausea, dizziness, and a headache. Lovett called for an ambulance and had Felton transported to the hospital. Felton suffered a stroke as a result of a dissection of a vertebral artery. He remained in the hospital for ten days and did not work for two years. He still suffers from headaches and double vision.

A dissection of the artery results in a tear of the lining of the blood vessel. Many dissections are asymptomatic and resolve on their own. However, on rare occasions, the artery can swell and narrow the opening or a blood clot forms at the location of the tear, either of which interrupts the blood supply to the brain causing a stroke. Felton sued Lovett based on three theories of negligence: 1) Lovett was too forceful in his third manipulation, thereby causing the artery dissection which resulted in a stroke, 2) Felton was already suffering a dissection when he came to see Lovett and Lovett should have recognized it and not performed any manipulations which then resulted in the stroke, and 3) Lovett failed to inform Felton of the risks and dangers of chiropractic treatment. The jury rejected the first two contentions and found for him on the third.

*Informed Consent*

Causes of action for informed consent are medical malpractice cases governed by §74.101 of the Civil Practice and Remedies Code. *Schaub v. Sanchez,* 229 S.W.3d 322, 323 (Tex. 2007). That statute provides:

> In a suit against a physician or health care provider involving a health care liability claim that is based on the failure of the physician or health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.[1]

TEX. CIV. PRAC. & REM. CODE ANN. §74.101 (Vernon 2005). A chiropractor is a health care provider under the statute. *Id.* §74.001(a)(12)(A)(v). And, whether the chiropractor at bar violated §74.101 depends upon whether he failed to disclose that which he had a duty to mention.

The Texas Medical Disclosure Panel, an entity created by the Texas Legislature, is charged with developing a list of risks and hazards which must be disclosed to patients. *Id.* §74.102(a) (Vernon Supp. 2010). However, its list is not all encompassing. There may be instances of medical and surgical procedures which the panel has not addressed. Should such an instance arise, like it did here, the provider or physician is not free to remain silent. Rather, he still must comply with the duties to disclose imposed upon him by laws other than §74.101 *et seq. Id.* §74.106(b) (Vernon 2005). One such duty is to inform the patient of risks "inherent" in the medical procedure to be

---

[1]Medical care is defined to mean "any act defined as practicing medicine . . . by one licensed to practice medicine in this state . . . ." TEX. CIV. PRAC. & REM. CODE ANN. §74.001(a)(19) (Vernon 2005). Lovett argued in his motion for new trial that he is not licensed to practice and does not practice medicine so he does not fall within the provisions of the statute. However, he did not raise this theory prior to trial.

3

performed.  *Binur v. Jacobo,* 135 S.W.3d 646, 654 (Tex. 2004); *Barclay v. Campbell*, 704 S.W.2d 8, 9 (Tex. 1986).

To be inherent, the risk must be one that exists in and is inseparable from the procedure itself.  *Barclay v. Campbell,* 704 S.W.2d at 10.   For instance, in *Barclay*, the Supreme Court had to decide whether the failure to disclose that tardive dyskinesia was a risk of ingesting certain drugs fell short of complying with the duty to disclose.  It explained that for the dyskinesia to be an inherent risk in taking the drug, the condition must arise from using the drug and not from any defect in the drug or from negligent human intervention.  *Id.*  In other words, the drug or procedure must alone present the risk for the latter to be inherent in the former; it is not enough if some additional factor, independent of the procedure, exists or occurs for the risk to arise.

The procedure at bar involved a manipulation of the cervical spine, while the risk consisted of a ruptured or dissected vertebral artery as a result of the manipulation. That Lovett did not inform Felton of the risk is undisputed.  Whether he had to is not.

Lovett's expert testified that "there is a risk from doing . . . manipulations to the cervical spine because *if there is a problem with the vertebral artery,* a . . . manipulation . . . could exacerbate that or increase the symptoms or cause more damage." (Emphasis added).  He also opined that "any type of manipulation, *if there's a problem with that [vertebral] artery or if the adjustment is delivered improperly,* that area can be compromised with the consequences being very severe."  (Emphasis added).  When asked if he had an opinion "as to whether or not a chiropractor, if he performs a neck adjustment correctly, can injure a healthy artery," the expert replied ". . . a *properly* administered . . . adjustment *cannot* harm a healthy vertebral artery."   (Emphasis

added).  The latter statement comports with testimony to the effect that "[c]urrent medical literature indicates that it is highly unlikely, if not impossible, for a cervical spine manipulation to injure a healthy vertebral artery."  He also stated that for the manipulation to have caused the dissection suffered by Felton, one of two other circumstances would have had to exist or occur.  First, Felton's vertebral artery would have to have been unhealthy or, second, the manipulation would have to have been applied improperly.  From this, we see that the potential for a dissection of the vertebral artery arose only when some other factor or condition was present.  If neither of those additional indicia was present, the manipulation would not have resulted in an arterial dissection.  So, the potential for the latter to occur did not exist in the procedure itself; nor was it inseparable from the procedure.

Simply put, the injury suffered by Felton was not an inherent risk of which Lovett had a duty to disclose at the time.  To the extent that the jury found otherwise, it erred as a matter of law.  *See Powers v. Floyd,* 904 S.W.2d 713, 715 (Tex. App.–Waco 1995, writ denied) (stating that whether the physician had a duty to disclose particular information is a legal question).  Moreover, the error was harmful for it was the basis upon which judgment was entered.  Thus, we sustain Lovett's contention that he had no duty to inform Felton of the potential for arterial dissection before administering the spinal manipulation, reverse the trial court's judgment, and render judgment denying Felton recovery against Lovett.


Brian Quinn
Chief Justice


5