

# NUMBER 13-09-00192-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ROBERT V. BUCK AND QUEEN ISABELLA
DEVELOPMENT JOINT VENTURE,                                      **Appellants,**

**v.**

G.J. PALMER JR.,                                                                      **Appellee.**

### On appeal from the 370th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Vela
### Memorandum Opinion by Justice Benavides

Appellants, Robert V. Buck ("Buck") and Queen Isabella Development Joint Venture ("Queen Isabella"), appeal the trial court's final summary judgment and two other orders rendered in favor of appellee, G.J. Palmer Jr. ("Palmer"). By five issues, Buck and Queen Isabella argue that the trial court erred by: (1) granting summary judgment that Queen Isabella was dissolved and that the value of Buck's interest on dissolution was zero; (2)

granting summary judgment on limitations; (3) refusing to require Palmer to produce personal financial statements; (4) denying Buck and Queen Isabella's motion to disqualify Palmer's counsel; and (5) granting affirmative declaratory relief to Palmer. We affirm.[1]

## I. BACKGROUND

### A. The Creation and Demise of Queen Isabella Development Joint Venture

On April 27, 1984, Buck, Palmer, John Thobe, and 1629 Service Corporation ("1629") entered into a joint venture agreement (the "partnership agreement") for the development of property in Port Isabel, Texas. The joint venture was named Queen Isabella Development Joint Venture, and the parties intended to purchase and develop property in Port Isabel to construct Queen's Point Marina and Yacht Club. Ownership of the joint venture was initially distributed as follows: Buck, Palmer, and Thobe each owned twenty percent, and 1629 owned forty percent.

Queen Isabella borrowed over $7 million for the marina from 1629's parent company, Peoples Savings and Loan ("Peoples"), and Palmer and Buck signed guaranties on the promissory notes. Palmer and Buck also borrowed $200,000 from 1629 to fund joint venture expenses. Construction began on the marina, and it opened for business. In 1986, Thobe's interest was transferred to 1629. Furthermore, in 1986, the marina was hit by three major storms, causing severe damage.

Peoples eventually stopped funding the joint venture and demanded payment of its promissory note. In 1988, the Federal Home Loan Bank Board determined that Peoples

---

[1] The summary judgment stated that it "dispose[d] of all claims and all parties" and was appealable. Palmer raises a conditional cross-issue in his brief, arguing that if the summary judgment in his favor is reversed, this Court should remand the entire case and allow him to present his claims for affirmative relief, which were not presented to the trial court for a ruling but were foreclosed by the trial court's rendition of a final summary judgment. Because we affirm the summary judgment, we need not reach this conditional cross-issue. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

2

was insolvent and appointed the Federal Savings and Loan Insurance Corporation as its receiver. The receiver transferred Peoples's assets to Texas Trust Savings Bank ("Texas Trust"), and later, CTX Holding Company ("CTX") succeeded to the interests of Texas Trust.

Palmer and Buck defaulted on their personal note from 1629, and Queen Isabella defaulted on the mortgage. In 1988, Thobe sued Palmer, Buck, and Peoples in Hidalgo County. Queen Isabella's creditors also attempted to foreclose on their note secured by the marina's property. Palmer and Buck engaged attorney Ramon Garcia to initiate lawsuits in Hidalgo County against Queen Isabella's lenders and against design professionals and contractors who had constructed the marina. Buck and Palmer, individually and on behalf of Queen Isabella, added these claims as a third-party action in Thobe's lawsuit against them. Eventually, Thobe's lawsuit was severed into three separate actions. Additionally, lawsuits were filed in Llano County by Texas Trust against Queen Isabella, Palmer, and Buck on the mortgage and by 1629 against Palmer and Buck on their personal loan (the "Llano County litigation"). Attorney John Griffith represented Palmer and Buck in the Llano County litigation.

In 1992, in the Llano County litigation, Texas Trust obtained a judgment against Queen Isabella for $14,865,977.80 and against Buck and Palmer individually for forty percent of that amount, or $5,946,391.12, under the terms of their guaranty. The judgment states that Texas Trust had the right to foreclose its lien against Queen Isabella's property. 1629 also obtained a personal judgment against Buck and Palmer in 1994. The Llano County litigation was ultimately settled after trial on September 29, 2005, and the negotiation of this settlement is the basis for the current dispute.

**B.    The Dispute Below**

3

The current lawsuit began on April 19, 1996, as a suit by Garcia against Palmer for legal fees. Buck was added as a defendant on June 13, 1997. Then, on July 22, 1997, Palmer filed a cross-claim against Buck. Palmer asserted that on various dates in 1993, he and Buck met to discuss the pending litigation, and Buck promised that if Palmer could arrange for a complete release of liability for Buck from the joint venture's indebtedness, Buck would transfer his interest in Queen Isabella to Palmer. Palmer alleged that Buck was not willing to assume any new liabilities and wanted to dissolve Queen Isabella as early as 1993, but at the very least by 1995, Buck made it clear that he had no desire to continue the joint venture. Palmer claimed that he thereafter negotiated a settlement of the Llano County litigation, which included a complete release of Buck's liability on Queen Isabella's indebtedness. The settlement agreement also provided for a transfer of 1629's interest in Queen Isabella to Palmer.

Palmer alleged that after the settlement agreement was negotiated with Queen Isabella's creditors, Buck refused to transfer his interest in Queen Isabella. Thus, Palmer sued Buck for breach of an oral agreement to transfer Buck's interest, requested specific performance, and requested a declaration that "Buck is equitably required to transfer the twenty percent interest in [Queen Isabella] which Buck alleges he still owns to Palmer . . . ." Palmer also sought a declaratory judgment, asking the court to declare the "interest of the said Palmer and Buck in Queen Isabella Development Joint Venture and in relation to the obligation, if any, for attorneys' fees alleged by Plaintiffs and Counter Defendants, Ramon Garcia and Ramon Garcia, P.C."

Buck denied the existence of the oral contract, asserted several defenses to enforcement of the alleged contract, and also asserted cross-claims against Palmer. Buck claimed that to induce him into settling the Llano County litigation, Palmer represented that

4

he would be responsible for executing a $600,000 promissory note secured by Queen Isabella's property in favor of CTX. Buck alleged that this representation was false, and instead of executing the promissory note individually, Palmer caused Queen Isabella to pay the note. As a result of this deceit, Buck alleged that Palmer acquired 1629's interest in Queen Isabella, making him the owner of eighty percent of Queen Isabella. Buck asserted that the joint venture continued to do business after settling the Llano County litigation in 1995, and in 1998, Palmer caused Queen Isabella to execute a promissory note payable to himself secured by all of Queen Isabella's real property. Palmer then assigned the note and collateral to Texas State Bank ("TSB") to collateralize his own promissory note in the amount of $780,000. Finally, Palmer caused Queen Isabella to sell a portion of the Port Isabel property to Port Isabel Land Company, Ltd. ("PILCO"), which was partly owned by Palmer. Thus, Buck claimed that Palmer had engaged in self-dealing with Queen Isabella's property.

Buck sought a declaration that he was still the owner of an interest in Queen Isabella and expressly requested the court to "determine the fair value of the interest in [Queen Isabella] owned by him." Buck also sought rescission of the agreement to transfer 1629's interest in Queen Isabella to Palmer and the transfer of Queen Isabella's property to PILCO in 1998. Buck asserted that Palmer: (1) committed constructive fraud and common law fraud; (2) breached the partnership agreement; (3) breached his fiduciary duties to Queen Isabella and to Buck; (4) committed securities fraud; and (5) conspired with Garcia, Griffith, and his other attorney, Samuel McDaniel, to cause Garcia to sue Buck for attorney fees. Buck requested injunctive relief, a receivership, an accounting, a constructive trust, disgorgement of profits, and winding up of the partnership. The trial court severed Garcia's claims for attorney fees from Buck and Palmer's cross-claims, and

5

the cross-claims proceeded as trial court cause number C-2058-96-G(1).

## C.     Buck Seeks Production of Palmer's Financial Statements

Buck deposed a TSB representative regarding transactions between Queen Isabella and Palmer, attempting to prove that Palmer used Queen Isabella's property to benefit himself in violation of duties Palmer owed to Queen Isabella and to Buck. Buck obtained a supboena and requested that TSB produce "loan documents" relating to Queen Isabella, which included financial statements.

At the deposition pursuant to the subpoena, TSB produced Palmer's personal financial statements. Palmer's counsel objected that the financial statements were confidential. The parties agreed to allow the court reporter to copy the documents and to submit them to the court under seal. On January 27, 2005, Buck filed a motion to overrule Palmer's objections to the production of his financial statements, and the trial court heard the motion on March 7, 2006. The court stated on the record that it would review the documents. Buck reminded the court of his request at various hearings throughout 2008, but the trial court kept the matter under advisement.

## D.     Buck Seeks to Disqualify Palmer's Counsel

On January 28, 2008, attorney Sarah Pierce Cowen filed a notice of appearance in the case on Palmer's behalf. On July 28, 2008, Buck moved to disqualify Cowen, alleging that Cowen was associated with Griffith's firm, Griffith & Garza, because she was at one time "of counsel" to that firm and had signed her name on pleadings filed by that firm in other cases. Because Griffith represented both Buck and Palmer in the Llano County litigation, Buck asserted that Cowen's association with Griffith's firm precluded her from representing Palmer. The trial court held a hearing on the motion to disqualify on August 19, 2008, and took the matter under advisement.

6

**E.      Palmer Moves for Summary Judgment on Dissolution of Queen Isabella**

On September 15, 2008, Palmer filed two separate motions for summary judgment. The first motion was titled "Palmer's No Evidence and Traditional Motions for Summary Judgment Based on Dissolution as to All Causes of Action by Robert V. Buck and Queen Isabella Development Joint Venture." In this motion, under separate headings, Palmer moved for summary judgment under the no-evidence standard and under the traditional summary judgment standard. The no-evidence argument stated the no-evidence standard and then argued: "In this case there is no evidence that buck [sic] had an interest in the partnership after dissolution. Consequently, Buck is not entitled to prevail on any of his claims." The next heading contained the traditional summary judgment standard and argued:

> In this [sic] present case there is no genuine dispute that dissolution occurred of the Queen Isabella Development Joint Venture some time prior to the filing date of this lawsuit. Therefore, Buck's remedy was to receive the value of his interest in the partnership when it was dissolved. It is also undisputed that[,] because of the massive debt[,] his value was no more than zero dollars.

Under another heading titled "Facts and Argument," Palmer set forth the factual background for the motion and the applicable law. Palmer argued that the Texas Uniform Partnership Act ("TUPA") applied to the joint venture. *See* Act of May 9, 1961, 57th Leg., R.S., ch. 158, 1961 TEX. GEN. LAWS 289, *expired* January 1, 1999, Act of May 31, 1993, 73rd Leg., R.S., ch. 917, 1993 TEX. GEN. LAWS 3887 (formerly TEX. REV. CIV. STAT. ANN. art. 6132b).[2] Palmer asserted that on various dates in 1993, 1995, and 1996, Buck expressed a desire to dissolve the partnership, which caused a dissolution of the partnership. Palmer argued that under TUPA, the remaining partners may elect to

---

[2] We will refer to sections within former article 6132b as "TUPA § __" for ease of reference.

continue with the partnership business, but the powers and duties from the relationship terminate except for those necessary to complete a winding up of the partnership. Thus, once Buck expressed his will to dissolve the partnership, Palmer owed him no further duties except with respect to winding up the partnership's existing obligations. Palmer argued that Buck was entitled to the fair value of his interest at the date of dissolution, which, because of the amount of debt owed by the partnership, was zero. For these reasons, Palmer argued that there were no causes of action that Buck could assert against Palmer for his actions after dissolution of the partnership. Palmer's motion referred to a separately filed appendix containing evidence supporting the motion.

Buck filed a response to the motion. He argued that he did not cause a dissolution, but even if he did, the partnership continued for the purpose of winding up. Thus, he claimed that Palmer's fiduciary duty was continuing. He argued that to wind up the partnership, the partnership business must be liquidated, and if a surplus remains after the discharge of partnership liabilities, it must be distributed to the partners in accordance with their capital accounts and profit sharing ratios. Thus, the partners share in the risks and rewards of the post-dissolution appreciation or depreciation of the partnership's assets. Buck then argued that he was entitled to elect whether to liquidate the partnership or to have his interest valued at the date of dissolution, and he did not elect to have his interest valued at the date of dissolution.

Buck attached evidence supporting his response. Buck also filed objections and moved to strike Palmer's summary judgment evidence. These objections went to the admissibility of Palmer's summary judgment evidence and not to the form or content of the motion itself.

**F.      Palmer Moves for Summary Judgment on Limitations**

8

Palmer's second motion for summary judgment was titled "Palmer's No Evidence and Traditional Motions for Summary Judgment as to All Causes of Action by Robert V. Buck and Queen Isabella Development Joint Venture." As with the first motion, Palmer set out the no-evidence and traditional standards for summary judgment under separate headings. Palmer argued that Buck bore the burden to show that he asserted his claims in court after the partnership ceased doing the business intended within the applicable statute of limitations. Palmer then argued that Buck's claims were barred under the various limitations periods applicable to the claims, arguing that Buck's claims accrued in 1987, when the partnership ceased doing business. Palmer filed a separate appendix containing evidence supporting the motion.

Buck responded and disputed that limitations barred his claims and provided evidence supporting the response. Buck further objected to Palmer's summary judgment evidence, but he did not object to the form of the motion.

## G.    The Trial Court Issues Its Rulings

On January 7, 2009, the trial court ruled on all the motions that are the subject of the current appeal. It denied Buck's motion to overrule Palmer's objections to the production of his financial statements and sustained Palmer's objections. It also denied Buck's motion to disqualify Cowen. Neither of these orders stated a basis for the trial court's ruling.

The same day, the trial court granted Palmer's motions for summary judgment and denied all of Buck's objections to Palmer's summary judgment evidence. This order, however, stated the following:

> The court GRANTS the following Palmer Motions for Summary Judgment on both No Evidence grounds and Traditional grounds:

1.  Palmer's No Evidence and Traditional Motions for Summary Judgment Based on Dissolution as to All Causes of Action by Robert V. Buck and Queen Isabella Development Joint Venture; and

2.  Palmer's No Evidence and Traditional Motions for Summary Judgment Based on the Statute of Limitations as to All Causes of Action by Robert V. Buck and Queen Isabella Development Joint Venture.

    The Court hereby GRANTS Judgment for G.J. Palmer, Jr.

    Further the Court grants judgment that G.J. Palmer, Jr. is the sole owner of Queen Isabella Development Joint Venture and all properties held in its name whether real or personal. . . .

    The Court finds that Queen Isabella Development Joint Venture was dissolved, at the latest, in June 1995, that the value of Robert V. Buck's interest in the venture at dissolution was zero, that G.J. Palmer, Jr. was entitled to carry on the business of the venture after dissolution, and that Buck's claims are barred by the Statute of Limitations.

    The Court orders Robert V. Buck and Queen Isabella Development Joint Venture take nothing by their suit against Palmer, and that Palmer recover costs of court.

This appeal ensued.

## II. MOTION TO DISQUALIFY

By their fourth issue, Buck and Queen Isabella argue that the trial court erred by denying their motion to disqualify Cowen. Buck and Queen Isabella assert that Griffith, who represented both Buck and Palmer in the Llano County litigation, had a conflict of interest once Buck and Palmer disputed the terms of the 1995 settlement agreement. Because Cowen was "associated" with Griffith's firm, Buck and Queen Isabella reason that Cowen also has a conflict of interest under rule 1.09(b) of the Texas Disciplinary Rules of Professional Conduct. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon Supp. 2008) (TEX. STATE BAR R. art. X,

10

§ 9). Buck and Queen Isabella argue that the judgment must be reversed and remanded because Cowen's participation in the summary-judgment proceedings tainted them beyond repair. Palmer claims that Buck and Queen Isabella waived this argument by waiting too long to file the motion to disqualify. We agree with Palmer.

## A. Standard of Review and Applicable Law

The denial of a motion to disqualify is reviewed for an abuse of discretion. *See Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 321 (Tex. 1994) (per curiam). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, or acted in an arbitrary or unreasonable manner." *Id.* Trial courts have no discretion in determining what the law is or applying the law to the facts. *WCM Group, Inc. v. Brown,* 305 S.W.3d 222, 229 (Tex. App.–Corpus Christi 2009, pet. dism'd by agr.). "A trial court does not abuse its discretion when it bases a decision on conflicting evidence—rather, a factual decision is an abuse of discretion only if there is no evidence to support the decision." *Id.* In this regard, we may not substitute our own judgment for the trial court's judgment. *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam). Likewise, we will not set aside the trial court's finding "unless it is clear from the record that the trial court could only reach one decision." *Id.* When the trial court does not issue findings of fact in conjunction with a ruling on a motion to disqualify, we imply all findings necessary to support the ruling. *See In re Hoar Const., L.L.C.* 256 S.W.3d 790, 795 (Tex. App.–Houston [14th Dist.] 2008, orig. proceeding) (reviewing an implied finding that a party did not waive a motion to disqualify opposing counsel).

"'Disqualification is a severe remedy.'" *Id.* (quoting *Spears v. Fourth Court of*

11

*Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)). When deciding a motion to disqualify, trial courts must "strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory tactic" because disqualification of counsel "can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice." *Id*.

It is well established that a party can waive its motion to disqualify opposing counsel by failing to timely file the motion. *See Turner v. Turner*, 385 S.W.2d 230, 236 (Tex. 1965); *see also In re EPIC Holdings, Inc.,* 985 S.W.2d 41, 52 (Tex. 1998); *Vaughan v. Walther,* 875 S.W.2d 690, 690 (Tex. 1994) (orig. proceeding) (per curiam)*.* "In determining whether a party has waived the complaint, the court will consider the length of time between when the conflict became apparent to the aggrieved party and when the aggrieved party filed the motion to disqualify." *In re Butler,* 987 S.W.2d 221, 224-25 (Tex. App.–Houston [14th Dist.] 1999, orig. proceeding). We must also consider any evidence that indicates the motion is being filed not due to a concern arising from the conflict of interest alleged but as a dilatory trial tactic. *See Wasserman v. Black*, 910 S.W.2d 564, 568 (Tex. App.–Waco 1995, orig. proceeding) (citing *Spears*, 797 S.W.2d at 656)).

## B.     Date the Conflict Became Apparent

The parties dispute when Cowen's conflict became apparent. Cowen filed her notice of appearance in this case on January 28, 2008, signing it as "The Law Offices of Sarah Pierce Cowen." Buck argues that his lead counsel, Charles Gorham, did not become aware that Cowen was associated with Griffith's law firm until June 2008, when the relationship between Cowen and Griffith was disclosed in open court. Buck then filed its motion to disqualify Cowen on July 28, 2008. Buck argues that, therefore, his motion

to disqualify was timely.

Palmer responds that Gorham's co-counsel in this case, Francisco Rodriguez, was aware that Cowen was participating in the case in January 2008 and was, at that time, aware of Cowen's relationship with Griffith's firm.[3] It is undisputed that in January 2008, Rodriguez was co-counsel with Gorham representing Buck in this litigation. The notice of appearance was admitted as an exhibit at the hearing on the motion to disqualify, and it states that it was served on Rodriguez on January 24, 2008.

Gorham questioned Cowen about his own knowledge of the conflict and told the court that he would put on testimony that no one on Buck's behalf knew of the association between Cowen and Griffith until June 2008. The following exchange occurred:

| [Buck's Lead Counsel]: | How would you expect me, as a lawyer, to know you were associated with the Griffith & Garza law firm in other matters? |
|---|---|
| [Cowen]: | Because your co-counsel is Frank Rodriguez, and I have known him for years and litigated against him for years, and he is familiar with my personal situation. |
| [Buck's Lead Counsel]: | And so what you are telling me is that Mr. Rodriguez as local counsel, knew of your involvement, and so you are attributing that to Mr. Buck? |
| [Cowen]: | That's the first thing that comes to mind. I don't know how you would learn it, but I know Mr. Rodriguez is familiar with that. |

---

[3] Palmer argued below and argues on appeal that Cowen was merely "of counsel" to Griffith & Garza a few years ago and now only serves as co-counsel on certain cases. Cowen testified that she does not have a permanent office, but rather, uses her co-counsels' office space in cases with those firms. She stated that Griffith & Garza have allowed her to use an empty office and desk at their firm's office. Cowen explained that she does not share attorney fees with Griffith & Garza, does not utilize the firm's staff or their phone lines for this case, does not have access to the firm's server, and has not discussed the case with Griffith. Because of our disposition of the waiver argument, we need not decide if this type of association would require Cowen's disqualification. *See* TEX. R. APP. P. 47.1.

13

No other evidence was presented on Rodriguez's knowledge of Cowen's association with Griffith.

Buck argues that this evidence is insufficient because it does not delineate what Rodriguez supposedly knew or the time frame of his knowledge; thus, there is no knowledge to impute to Buck. Additionally, citing *In re EPIC Holdings,* Buck argues that even though Rodriguez knew of the connection, he did not communicate it to Gorham; therefore, waiver should not be based on this information. 985 S.W.2d at 52. We disagree.

First, Cowen's testimony that Rodriguez knew her and litigated against her "for years" and was aware of her situation is some evidence that Rodriguez knew that Cowen had been associated with Griffith's firm. Furthermore, the questioning, in context, shows that Cowen meant that Rodriguez knew about the facts giving rise to the alleged conflict when Cowen appeared in the lawsuit—she expressly stated that she believed the knowledge should be imputed to Buck and to Gorman prior to the June 2008 hearing, where Gorman claimed to have first learned of the conflict. Because the trial court did not issue any findings of fact, we presume that the trial court determined that Rodriguez knew about Cowen's association with Griffith in January 2008, and because this finding was supported by evidence in the record, it was not an abuse of discretion. *See WCM Group, Inc.,* 305 S.W.3d at 229; *In re Hoar Const., L.L.C.* 256 S.W.3d at 795.

Second, an attorney's knowledge or notice that is acquired during the existence of the attorney-client relationship is imputed to the client. *See Am. Flood Research Ins. v. Jones*, 192 S.W.3d 581, 584 (Tex. 2006) (per curiam); *Lehrer v.* Zwerneman, 14 S.W.3d

14

775, 778 (Tex. App.–Houston [1st Dist.] 2000, pet. denied). *In re EPIC Holdings* does not render this rule inapplicable in this case. In that case, Anderson sued EPIC Holdings and its chief executive officer, George, for breaching fiduciary duties to EPIC Holdings's shareholders by exorbitantly compensating executives in connection with the acquisition of EPIC Holdings by HealthTrust, Inc.—The Hospital Company. *In re EPIC Holdings, Inc.*, 192 S.W.3d at 43-44. The law firm of Johnson & Gibbs represented George and EPIC Holdings in the acquisition and negotiation of executive compensation. *Id.* at 45-46.

One of the Johnson & Gibbs lawyers who worked on the merger, Jakes Jordaan, left Johnson & Gibbs to form the firm of Jordaan, Howard & Pennington. *Id.* at 45. When Anderson filed suit against George and EPIC Holdings, she was represented by James E. Pennington, a member of Jordaan's firm. *Id.* at 46. George and EPIC Holdings, however, were represented by Jerry R. Selinger, who was unaware of the connection. *Id.* at 46. The Texas Supreme Court determined that Pennington was disqualified and that George and EPIC Holdings did not waive their motion to disqualify, noting that:

> Anderson argues that EPIC and George waived disqualification of her counsel by waiting over four months after suit was filed to raise the issue and seven more months to file their motions. We think EPIC and George have satisfactorily explained these delays. For four months after Anderson filed suit defendants' counsel was unaware of the connection between attorney Pennington's firm and Johnson & Gibbs. Johnson & Gibbs, who was representing EPIC in the HealthTrust merger, recognized the connection but did not communicate it to defendants' litigation counsel.

*Id.* at 52.

*In re EPIC Holdings* is distinguishable because the party's attorney who had knowledge of the conflict was not representing the party in the litigation where disqualification was asserted. *Id.* That is not the case here: Rodriguez was Gorham's co-

15

counsel representing Buck in this lawsuit at the time that Cowen appeared on behalf of Buck's opponent. Thus, Rodriguez's failure to communicate the conflict to Buck's lead counsel, Gorham, does not excuse the delay in filing the motion to disqualify.

## C. Length of Delay and Prejudice to Palmer

Because we hold that Buck acquired knowledge of the conflict in January 2008, the delay in filing the motion amounts to nearly seven months. Aside from his argument that Gorham was unaware of the conflict, Buck has offered no other explanation to justify the seven-month delay in filing the motion to disqualify. The Texas Supreme Court has held that an unexplained delay of six and a half months before filing a motion to disqualify waives the motion. *See Vaughan,* 875 S.W.2d at 691. The delay in this case was even longer. *See id.*

Nevertheless, Buck argues that Palmer was required to present evidence that he was prejudiced by the delay and points out that the motion was not filed on the eve of trial, again citing *In re EPIC Holdings. See* 985 S.W.2d at 53. The Texas Supreme Court has never held that proof of prejudice is required to sustain a claim of waiver under these circumstances, *see Spears,* 797 S.W.2d at 656 n.1*,* and *In re EPIC Holdings* does not state as much. *See* 985 S.W.2d at 53. Rather, in that case, after finding that EPIC Holdings and George sufficiently explained their delay in filing the motion to disqualify, the court simply noted that Anderson had not suffered any prejudice as a result of the delay. *See id.* ("It is of some importance that in the eleven months before the motions to disqualify were filed almost no discovery was conducted except on disqualification issues. The delay in filing the motions did not prejudice Anderson's prosecution of her claims.").

We read *In re EPIC Holdings* as following the traditionally-accepted rationale that

16

reviewing courts must apply an exacting standard when reviewing motions to disqualify, which are disfavored, and evidence that a party is using the motion as a dilatory tactic is merely relevant to the determination of waiver. *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 468 (Tex. 1994) ("The untimely urging of a disqualification motion lends support to any suspicion that the motion is being used as a tactical weapon."). In fact, in cases involving a lengthy delay, such as the one here, courts have refused a motion to disqualify without discussing whether trial was impending. *See HECI Exploration Co. v. Clajon Gas Co.,* 843 S.W.2d 622, 628-29 (Tex. App.–Austin 1992, writ denied); *Conoco Inc. v. Baskin,* 803 S.W.2d 416, 420 (Tex. App.–El Paso 1991, orig. proceeding) (noting that an eleven-month delay, without regard to a trial setting, was enough to find waiver, and then recognizing that a four-month delay would also support a waiver because although it was shorter, it was more significant in the context of the close trial date).

Regardless, even if we applied *In re EPIC Holdings* the way Buck proposes, we would still find waiver. There, the Texas Supreme Court noted that no activity, other than discovery related to disqualification, had occurred during the delay, and therefore, Anderson was not prejudiced. *See* 985 S.W.2d at 53. That is not the case here. Cowen appeared in January 2008, and the record reflects that there was substantial activity in the case on the merits between the time that Cowen appeared as Palmer's counsel and the time the motion to disqualify was filed.

For example, the docket sheet shows that the case was set for trial in April 2008 and that the parties were preparing for trial.[4] Palmer moved to exclude Buck's experts at the

---

[4] Buck concedes in his brief that the case was scheduled for a jury trial on May 17, 1999; October 18, 2004; March 14, 2005; October 9, 2007; February 11, 2008; April 14, 2009; and October 20, 2009, and those dates were continued.

17

end of March 2008, and Buck filed his trial exhibits, his list of trial witnesses, and a motion in limine on April 1, 2008. The April trial date was passed, but not without the parties having prepared for trial. Additionally, the docket sheet shows that Palmer filed a motion for no-evidence and traditional summary judgment[5] on March 19, 2008 and that this motion was heard on April 10, 2008. Furthermore, Palmer had filed special exceptions, and these were heard on June 10, 2008. Cowen appeared on Palmer's behalf at this hearing. Thus, even if we were required to examine the proceedings between Cowen's appearance and the filing of the motion to disqualify, we could not say that Palmer was not prejudiced. Accordingly, we hold that the trial court did not abuse its discretion in refusing to disqualify Cowen as Palmer's attorney, and we overrule Buck's fourth issue.

### III. SUMMARY JUDGMENT

By their first issue, Buck and Queen Isabella argue that the trial court erred by granting Palmer's no-evidence and traditional motions for summary judgment on dissolution. They argue that Palmer's motion was based on a defensive issue—dissolution—and relied on evidence Palmer attached to the motion, which converted it into a traditional motion for summary judgment. Furthermore, Buck and Queen Isabella argued that Palmer failed to conclusively establish dissolution on the dates alleged and that the value of Buck's interest was zero. Finally, they argue that to the extent the burden shifted to them, they presented evidence to defeat the motion. For the reasons that follow, we disagree.[6]

### A. Standards of Review

---

[5] This particular motion was not included in the record on appeal, but it is reflected on the docket sheet.

[6] Because we affirm the summary judgment on dissolution grounds, we need not address the limitations arguments. *See* TEX. R. APP. P. 47.1.

18

The trial court granted both of Palmer's motions for summary judgment. Buck argues that the trial court made factual findings in the judgment, including that: (1) Queen Isabella was dissolved at the latest in June 1995; (2) Buck's interest at the date of dissolution was zero; (3) Palmer was entitled to carry on the business of the venture; and (4) Buck's claims were barred by limitations. Buck argues that these factual findings are inappropriate because, as a matter of form, findings and conclusions should not be contained in the judgment itself. We agree. Thus, we do not consider the factual findings set out in the judgment. *See* TEX. R. CIV. P. 299a; *IKB Indus. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex. 1997) ("The trial court should not make, and an appellate court cannot consider, findings of fact in connection with a summary judgment.").[7]

We review the grant of summary judgment as we would a summary judgment that failed to state the grounds for its rulings. Under these circumstances, we must affirm the judgment if any of the grounds alleged in the motions were meritorious. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). The standard of review we apply is determined by whether the motion was brought on no-evidence or traditional grounds. *See* TEX. R. CIV. P. 166a(c), (i); *see also Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 771 (Tex. App.–Corpus Christi 2003, no pet.) (op. on reh'g).

---

[7] In their fifth issue, Buck and Queen Isabella argue that the trial court erred by declaring in the judgment that Palmer is the sole owner of Queen Isabella and all properties held in its name whether real or personal. Buck and Queen Isabella argue that Palmer did not move for summary judgment on his affirmative claims for declaratory relief, and moreover, Palmer did not include a request for this type of declaratory relief in his pleadings. We do not read this statement in the judgment as a grant of declaratory relief, but rather, as a factual finding that results from the final summary judgment on Buck's claims. Simply put, because the trial court granted summary judgment that the partnership was dissolved as to Buck, and Palmer owned the remaining interest, Palmer became the sole owner of the partnership. As we stated above, however, we must disregard the factual findings because they are inappropriately contained in the summary judgment order. Because we are affirming the summary judgment without considering the factual findings, Buck and Queen Isabella have not shown any harm suffered by the inclusion of this language. *See* TEX. R. APP. P. 44.1 (requiring appellant to show that the error probably caused the rendition of an improper judgment). Thus, we overrule Buck and Queen Isabella's fifth issue.

19

A no-evidence summary judgment is equivalent to a pretrial directed verdict, and we apply the same legal sufficiency standard on review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Ortega*, 97 S.W.3d at 772. Once an appropriate motion for no-evidence summary judgment is filed, the burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion. TEX. R. CIV. P. 166a(i). We may not consider any evidence presented by the movant unless it creates a fact question. *Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex. 2004); *Newkumet v. Allen*, 230 S.W.3d 518, 521 (Tex. App.–Eastland 2007, no pet.).

To defeat a no-evidence motion for summary judgment, the non-movant must merely produce a scintilla of probative evidence to raise a genuine issue of material fact. *Ortega*, 97 S.W.3d at 772. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has met its burden, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

We review the trial court's granting of a traditional motion for summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.–Corpus Christi 2003, no pet.). When

20

reviewing a traditional summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The movant bears the burden of proof in a traditional motion for summary judgment, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

We will affirm a traditional summary judgment only if the record establishes that the movant has conclusively proved its defense as a matter of law or if the movant has negated at least one essential element of the plaintiff's cause of action. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997); *Clear Creek Basin Auth.*, 589 S.W.2d at 678. A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller*, 168 S.W.3d at 816. Only when the movant has produced sufficient evidence to establish its right to summary judgment does the burden shift to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *see Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

When a party moves for summary judgment under both rules 166a(c) and 166a(i)

of the Texas Rules of Civil Procedure, we will first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether appellee's summary judgment proof satisfies the rule 166a(c) burden. *Id.*

**B.  Procedural Arguments Against the No-Evidence Motion on Dissolution and the Value of Buck's Interest in Queen Isabella**

Initially, we must address two procedural arguments Buck makes against Palmer's no-evidence motion. First, Buck argues that because Palmer's motion cited the evidence submitted along with the motion, we must treat the motion as a traditional motion for summary judgment, placing the initial burden to produce evidence on Palmer. Buck cites our decisions in *Michael v. Dyke*, 41 S.W.3d 746, 751 (Tex. App.–Corpus Christi 2001, no pet.), and *Graham Land & Cattle Co. v. Independent Bankers Bank*, 205 S.W.3d 21, 28-29 (Tex. App.–Corpus Christi 2006, no pet.). We disagree.

In *Michael*, we held that "[w]hen it is not readily apparent to the trial court that summary judgment is sought under rule 166a(i), the court should presume that it is filed under the traditional summary judgment rule and analyze it according to those well-recognized standards." 41 S.W.3d at 751. In that case, we treated Dyke's motion as a traditional motion for summary judgment because it "intermixe[d] language from the traditional summary judgment rule and the no-evidence rule, fail[ed] to clearly state under which rule summary judgment [was] sought, fail[ed] to follow rule 166a(i) precisely by identifying the particular elements in dispute, and attache[d] evidence that would be appropriate for a traditional motion, but not a no-evidence motion." *Id.* at 752.

After *Michael*, the Texas Supreme Court decided *Binur v. Jacobo*, 135 S.W.3d 646,

22

650-51 (Tex. 2004). In that case, the court held that although it is better to file separate motions for traditional and no-evidence summary judgment, parties may file hybrid motions. *Id.* at 651. Furthermore, although delineating the different grounds under separate headings would help the bench and bar, the rules do not require it. *Id.* Most importantly, however, the court held that we, as reviewing courts, cannot disregard a motion for no-evidence summary judgment merely because it attaches evidence. *Id.* Rather, in that circumstance, we must simply disregard the attached evidence when reviewing the no-evidence grounds unless the evidence raises a fact issue in favor of the non-movant. *Id.*

Our later holding in *Graham Land & Cattle* did not, and moreover could not, change the rule in our jurisdiction back to its pre-*Binur* state. *See* 205 S.W.3d at 28-29. In *Graham Land & Cattle*, we held that a motion did not raise no-evidence grounds because it made two obscure references to the lack of evidence of an element, the references to the lack of evidence were made within the traditional summary judgment arguments, and, as an additional problem, the motion cited to the summary judgment evidence as supporting the no-evidence arguments. *Id.* at 29.

Palmer's motion for summary judgment, however, separately stated the standards for no-evidence and traditional summary judgment and expressly stated the basis for the no-evidence motion. Although Palmer referenced summary judgment evidence in a separate section entitled "Facts and Argument," Palmer's motion clearly asserted no-evidence grounds. *Binur*, 135 S.W.3d at 651. Accordingly, we may not treat Palmer's motion as a traditional motion simply because it attached evidence; rather, we ignore Palmer's evidence unless it raises a fact issue. *Id.*

Second, Buck argues that Palmer's motion was defective because a no-evidence

23

motion may only attack a claim or defense "on which an adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). Buck argues that Palmer's no-evidence arguments, that dissolution occurred and that the value of Buck's interest in the partnership was zero, were asserted in a defensive posture to Buck's claims. We disagree.

First, Palmer's argument that the partnership was dissolved in 1995 is actually a challenge to Buck's standing to assert claims against him for actions he took after dissolution. In every case, a party must have standing to litigate the matters in issue. *See Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex. 1984). Because standing is a prerequisite to the maintenance of a lawsuit, a party may move for no-evidence summary judgment on his opponent's standing to bring suit. *See* TEX. R. CIV. P. 166a(i); *Tex. Ass'n of Bus. v. Tex. Air Ctrl. Bd.*, 852 S.W.2d 440, 444 (Tex. 1993); *see also Bank of Am. v. Eisenhauer*, No. 13-09-00004-CV, 2010 WL 2784031, at *6 (Tex. App.–Corpus Christi July 15, 2010, no pet.) (mem. op.) (holding that the trial court erred by denying the defendant's no-evidence motion based on the plaintiff's standing to sue). Arguments like Palmer's—that a partner has no right to sue another partner for breach of fiduciary duty or fraud after dissolution except to the extent that the liability arises from winding up the partnership—raise the issue of whether the partner has standing to sue. *See Rodgers v. RAB Invs., Ltd.*, 816 S.W.2d 543, 546-47 (Tex. App.–Dallas 1991, no writ) (addressing a partner's standing to sue in this context).

Second, Palmer's argument that the value of Buck's interest in the partnership was valued at the date of dissolution and was zero attacks Buck's action for an accounting and for distribution of the value of his partnership interest. Buck would have the burden at trial to prove the value of his interest, and Palmer argues that he has no evidence to prove that

24

it was anything greater than zero. *See Bader v. Cox*, 701 S.W.2d 677, 683 (Tex. App.–Dallas 1985, writ ref'd n.r.e.) ("Thus, to recover the value of decedent's interest in the dissolved partnership, Ms. Bader has the burden of proving the market value of, and decedent's share of, the partnership assets."); *Cauble v. Handler*, 503 S.W.2d 362, 364 (Tex. Civ. App.–Fort Worth 1973, writ ref'd n.r.e.) ("We agree that the burden of proof in this accounting case was on the plaintiff to show that Handler was indebted to the deceased's estate and to show the amount of such debt. Plaintiff thus had the burden to prove the market value of the partnership assets.").

Accordingly, we hold that Palmer's no-evidence motion appropriately challenged issues on which Buck would bear the burden of proof at trial, and it shifted the burden to Buck to produce evidence that he had an interest in the partnership on the dates of the alleged actions that form the basis of his claims against Palmer and the value of his interest for which he sought distribution.[8]

## C. Date of Dissolution and Buck's Standing

In response to Palmer's no-evidence motion, Buck submitted his own affidavit and several documents he claims demonstrate that after settling the Llano County litigation in September of 1995, he continued to own a twenty percent interest in Queen Isabella and that the partnership was not dissolved. Palmer, on the other hand, argues that Buck's evidence shows that in the summer of 1995, Buck expressed his intent to dissolve the partnership. Palmer argues that Queen Isabella continued with Buck as a partner for the sole purpose of winding up and terminating the partnership, and the settlement of the Llano

---

[8] We note that on appeal, Buck does not argue that the motion failed to set forth the elements of the causes of action being challenged by the no-evidence motion. *See* TEX. R. CIV. P. 166a(i) ("The motion must state the elements as to which there is no evidence.").

County litigation was merely part of that process. Because all of Buck's claims for damages were based on actions Palmer took after dissolution, when Buck no longer had an interest in the partnership, Buck had no standing to assert claims for damages to himself or to Queen Isabella based on these actions. These arguments require this Court to analyze the law of dissolution, winding up, and termination of partnerships, which we will do before addressing Buck's evidence.

### 1. Dissolution, Winding up, and Termination of Partnerships

The parties agree that TUPA governs this case.[9] TUPA discusses three different concepts that apply in this case: dissolution, winding up, and termination of the partnership. TUPA § 29 (defining dissolution); *id.* § 30 (explaining that dissolution does not terminate the partnership, which continues until winding up); *id.* § 37 (explaining right to wind up); *see Woodruff v. Bryant*, 558 S.W.2d 535, 538 (Tex. Civ. App.–Corpus Christi 1977, writ ref'd n.r.e.) (citing *McKellar v. Bracewell*, 473 S.W.2d 542, 549 (Tex. Civ. App.–Houston [1st Dist.] 1971, writ ref'd n.r.e.)). "Dissolution" is defined as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." TUPA § 29.

TUPA clarifies that "[o]n dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." *Id.* § 30. In other words,

> [g]enerally when a partnership is dissolved, the partnership continues during the period of winding up until all preexisting matters are terminated. Dissolution is an act that actually changes the legal relationship of the partnership, and has nothing to do with whether or not the partnership business is continuing or winding up. It is a technical legal concept, unlike

---

[9] TUPA was replaced by the Texas Revised Partnership Act ("TRPA") effective January 1, 1994. *See* Act of May 9, 1961, 57th Leg., R.S., ch. 158, 1961 TEX. GEN. LAWS 289 (formerly TEX. REV. CIV. STAT. ANN. art. 6132b), *expired* January 1, 1999, Act of May 31, 1993, 73rd Leg., R.S., ch. 917, 1993 TEX. GEN. LAWS 3887. However, TRPA contained transition rules providing that TUPA would apply to existing partnerships for a period of years, and the parties agree that it applies in this case.

26

the concept of dissolution in other areas, such as corporations. . . . The causes [of dissolution] set out in [section 31] are automatic and dissolution occurs immediately upon the happening of the specified event.

*Woodruff*, 558 S.W.2d at 539. After dissolution, the partnership continues for the limited purpose of winding up the affairs of the partnership. *Id.* "It is only upon termination that the final partnership relationship ceases to exist." *Id.*

Every partner has the right to dissolve the partnership, which may either be in compliance with or in violation of the partnership agreement. *Id.* Dissolution may be caused by several different acts, which are set out in TUPA section 31, and include the following:

Dissolution is caused:

(1) Without violation of the agreement between the partners,

    (a) By the termination of the definite term or particular undertaking specified in the agreement,

    (b) By the express will of any partner when no definite term or particular undertaking is specified,

    (c) By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking,

    (d) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners;

(2) In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this Section, by the express will of any partner at any time; . . . .

TUPA § 31. Thus, under TUPA, a partner may dissolve the partnership by his express will, which may either be in compliance with or in violation of the partnership agreement. *Id.*

When a partnership is dissolved in violation of the partnership agreement, TUPA

27

provides that the partners who "have not wrongfully dissolved the partnership . . . [have] the right to wind up the partnership affairs; provided, however, that any partner, his legal representative or his assignee, upon cause shown, may obtain winding up by the court." *Id.* § 37. We now turn to Buck's evidence.

## 2. Buck's Evidence

Buck's evidence includes a letter dated June 16, 1995, from him to Palmer regarding the settlement of the Llano County litigation. It states:

> Further, as I have previously informed you, I have no desire to embark into any [Queen Isabella] land development scenario with you. However, my 20% ownership in the [Queen Isabella] property will be made available to the development entity after the resolve [sic] of the Construction Defect Lawsuit, your payment in full to 1629 for your purchase of its 60% ownership interest, and immediately prior to the start of any development of the [Queen Isabella] property.

Later, on June 26, 2005, Buck sent a letter to Garcia, which stated:

> I have never made an "announcement" to you, Jay Palmer, Tom Matlock, or anyone else that I was not interested in resolving the issues surrounding [Queen Isabella], nor that I would be willing to relinquish any element of my rights in the existing [Queen Isabella] partnership. However, you and Jay Palmer have been told that I have absolutely no desire whatsoever to participate in any future development of the [Queen Isabella] property with you and/or Jay Palmer.

Although Buck's affidavit states that "[e]xcept in connection with my request for relief in this lawsuit, on no occasion have I declared dissolution of [Queen Isabella],"[10] he expressly admits that on several occasions he and Palmer "expressed our desire to change our business relations." He states:

---

[10] Palmer argues, and we agree, that this is a legal conclusion that is incompetent summary judgment evidence. *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex. 1984) ("By stating that his contractual obligation had been modified, Michael asserted nothing more than a legal conclusion."); *Ramirez v. Transcon. Ins. Co.* 881 S.W.2d 818, 829 (Tex. App.–Houston [14th Dist.] 1994, writ denied) (holding that an objection that the summary judgment evidence states a legal conclusion is a defect of substance that may be raised for the first time on appeal).

28

Palmer and I have told each other that we did not wish to be in business together. For example, by letter dated August 1, 1995, my attorney, John Ray, stated, "I am advised by Mr. Buck that both he and Mr. Palmer made it known during the July 5, 1995 Settlement Status Conference in Llano County that neither of the gentlemen wishes to have any further business relationships together." . . . . Palmer expressed the same sentiment to me by letter dated January 11, 1996.

Both of these letters are included in Buck's summary judgment evidence.

Buck claims that several documents executed around the same time reaffirmed the existence of the Queen Isabella partnership and his interest in the partnership. First, he points to an amendment to the partnership agreement executed on September 29, 1995, which reflects that Palmer acquired 1629's sixty-percent interest in the partnership and states that Buck is a twenty percent interest owner in Queen Isabella. Second, Buck points to the settlement agreement resolving the Llano County litigation, which was also executed on September 29, 2005. The settlement agreement provides for the assignment of 1629's interest to Palmer and provides that Palmer will own eighty percent of Queen Isabella and Buck will own twenty percent.

### 3.     Analysis

The first question that must be answered is whether Buck dissolved the partnership by his communications in the summer of 1995. As noted above, a dissolution may be caused by the "express will" of a partner. TUPA § 31(1)(b), (2). The parties dispute whether Buck dissolved the partnership through his statements that he had "no desire to embark into any [Queen Isabella] land development scenario with [Palmer]," that he had "absolutely no desire whatsoever to participate in any future development of the [Queen Isabella] property" with Palmer, that he had "expressed [his] desire to change [his] business relations" with Palmer, and that he did not wish to have "any further business

29

relationships together." We hold these statements were sufficient to constitute notice of Buck's "express will" to terminate the partnership.

As explained above, dissolution means "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." *Id.* § 29. It is hard to imagine a more clear statement of intent to dissolve than that expressed by Buck, where he used the precise definition of dissolution in his statements regarding continuation of the partnership business. *See id.* He wanted to "change [his] business relations," he did not want "any further business" with Palmer, and he did not want to participate in any future development of the property, which was the sole purpose of the joint venture as stated in the partnership agreement. *See id.* Under these circumstances, we hold that Buck dissolved the partnership in the summer of 1995, and the dissolution was automatic upon the making of these statements. *See Woodruff,* 558 S.W.2d at 540 (holding evidence was legally sufficient to support finding of dissolution where partner stated that she "wanted to get out of it");[11] *id.* at 539 ("The causes set out in [section] 31 are automatic and dissolution occurs immediately upon the

---

[11] While we held in *Woodruff* that the evidence was legally sufficient to support the jury's finding of dissolution, we also held that it was factually insufficient based on facts in that case that are not present here. *Woodruff v. Bryant*, 558 S.W.2d 535, 540 (Tex. Civ. App.–Corpus Christi 1977, writ ref'd n.r.e.). In that case, Bryant quit an existing partnership and entered into a partnership with a competitor. *Id.* at 538. The remaining partners sued Bryant for breach of her fiduciary duty not to compete. *Id.* Bryant claimed that prior to competing with the partnership, she expressed her will to dissolve the partnership by sending a letter to the remaining partners that she "wanted to get out of it." *Id.* at 540. We held that evidence was sufficient to support the jury's finding that she dissolved the partnership prior to competing with it. *Id.* However, we held that the evidence was factually insufficient to support the finding because Bryant's letter was ambiguous, stating that she intended to sell her interests in accordance with the partnership agreement's bylaws. *Id.* at 540-42. The evidence showed that she did not comply with the bylaws' procedures for selling her interest. *Id.* By her own testimony, she assumed the other partners rejected her offer and that she was still a partner, and she continued to receive partnership profits and to participate as a partner. *Id.* That is not what we have here. Here, Buck did not state he intended to continue as a partner or invoke the partnership agreement, but rather, unequivocally stated that he wished not to engage in any future partnership business. And as we explain next, the settlement agreement was consistent with winding up the partnership business by settling the existing lawsuits against the partnership, not with continuing the partnership business.

30

happening of the specified event.").[12]

The amendment of the partnership agreement and the settlement of the Llano County litigation are not inconsistent with dissolution, but rather, evidence the purpose of winding up of the partnership's existing affairs. *See* TUPA § 30; *Woodruff*, 558 S.W.2d at 539. It is undisputed that the Llano County litigation was pending in the summer of 1995, when Buck expressed his will to dissolve the partnership. The litigation was instituted against Queen Isabella, and the settlement agreement necessarily required the partners responsible for the liability on the promissory notes be a part of the settlement agreement. *See* TUPA § 15(1) ("Except as provided by Paragraph (2) of this Section, all partners are liable jointly and severally for all debts and obligations of the partnership including those under Sections 13 and 14); *id.* § 36(1) ("The dissolution of the partnership does not of itself discharge the existing liability of any partner."). The dissolution occurred before the settlement in September 1995, but the settlement did not reinstate the dissolved partnership.

In sum, we agree that a dissolution occurred as a result of Buck's statements in the summer of 1995. Palmer's motion for no-evidence summary judgment argued that all of

---

[12] Buck argues that Palmer's pleadings at the time he initiated this lawsuit insisted on the continued existence of the joint venture between them, and the live pleadings at the time of summary judgment also continued along those lines. We disagree. First, Buck cites to Garcia's original petition for attorney fees, which emphatically cannot constitute an admission by Palmer. Second, Buck cites to the first two pages of Palmer's second amended cross-claim, where he recites the history of the partnership and notes that he and Buck "were" partners in Queen Isabella and each owned twenty percent initially. Nowhere on those two pages did Palmer admit that Buck retained a twenty percent interest after settlement of the Llano County litigation. Third, Buck cites Palmer's second amended petition in the severed action. In this pleading, however, Palmer expressly states that in December 1993, Buck "was not willing to assume any new liabilities and preferred getting out of the venture rather than incurring new obligations." Palmer's pleadings acknowledge that "[a]t the time of the December 1993 meetings and agreements alleged above, Mr. Palmer and Mr. Buck were partners and had fiduciary duties to each other." We fail to see, however, how these statements are in any way inconsistent with Palmer's argument that in the summer of 1995, Buck caused a dissolution. Accordingly, Palmer's pleadings do not require reversal of the summary judgment and do not constitute evidence supporting Buck's arguments.

Buck's causes of action were based on actions Palmer took after dissolution, at a time when Palmer was entitled to continue the partnership and engage in new business and when Buck no longer had an interest in the partnership. *Woodruff*, 558 S.W.2d at 542; *see also Nielsen v. Nielsen*, No. 13-97-338-CV, 1999 WL 34973311, at *5 (Tex. App.–Corpus Christi Aug. 19, 1999, no pet.) (not designated for publication) ("The rule is that the fiduciary relationship between partners comes to an end as to new business commenced after the date of dissolution. New business encompasses transactions which are neither unfinished partnership business commenced prior to dissolution or transactions rightfully belonging to the partnership during the wind-up stage."). Because Buck did not present evidence that he had an interest in the partnership after the summer of 1995, he had no standing to maintain his suit against Palmer for new business the partnership engaged in after dissolution.[13]

## D.    Value of Buck's Interest in Queen Isabella

Buck argues that his interest should be valued as of the date of the distribution, which according to him has not yet occurred, instead of the date of dissolution. He bases his argument on the partnership agreement and on TUPA section 38, arguing that he had a right to insist on liquidation of the partnership's assets and to receive his distribution from the excess of assets over liability. *See* TUPA § 38. Palmer, on the other hand, argues that

---

[13] Buck argues that even if the partnership was dissolved, Palmer is not entitled to summary judgment on all of his claims. He argues that his fraud claim is based on a representation by Palmer that Palmer would be personally responsible for paying a $600,000 promissory note as part of the September 29, 2005 settlement agreement rather than causing Queen Isabella to be liable for it. Thus, he argues that Palmer's fraud and breach of fiduciary duties predated any 1995 dissolution. Buck cites his pleadings in this case, wherein he relied on this representation as the basis for his fraud claim, but this pleading does not give a time frame for the representation or demonstrate that it occurred prior to Buck's statements in the summer of 1995 when Buck caused the dissolution. As we explain next, the value of Buck's interest was set on the date of dissolution, and Buck failed to prove it was greater than zero. Thus, whether Palmer or Queen Isabella executed the promissory note to settle the litigation was irrelevant. Accordingly, Buck has not presented evidence to defeat summary judgment on his fraud claim.

Buck's interest must be valued at the date of dissolution because Buck dissolved the partnership in contravention of the partnership agreement,[14] and Buck has no evidence that the value at that time was more than zero. *See id.* Buck counters that even if the value was set on dissolution, he was entitled to share in the settlement of liabilities and the appreciation of joint venture property during the winding up process, and he presented evidence of the value of the partnership property. We agree with Palmer.

### 1. Value of Partnership Interest at Dissolution or Distribution?

As we noted earlier, dissolution may be caused by the express will of the partners, which may be in accordance with or in violation of the partnership agreement. *Id.* § 31. Under section 38, whether dissolution was in violation of the agreement determines the dissolving partner's right to a distribution. *Id.* § 38. When a definite term has been specified in the partnership agreement, a partner may dissolve the partnership without violating the agreement if the term has expired at the time of dissolution. *Id.* § 31(1)(a). If the definite term has not expired, dissolution by the partner's express will is in violation of the agreement. *Id.* § 31(2). Palmer argues that Buck dissolved the partnership in contravention of the partnership agreement because the agreement provided for a specified term that had not expired. We agree.

Buck submitted the partnership agreement as part of the summary judgment evidence. It states that the purpose of Queen Isabella was to "acquire certain real property situated in Cameron County, Texas," which it described in a separate schedule. The term

---

[14] Buck argues that Palmer did not make this argument in the trial court. We disagree. Palmer argued that the relevant date was the date of dissolution, which we hold was sufficient to raise the issue because the applicable law only provides for a distribution on this date if the dissolution is in violation of the partnership agreement. To the extent that Buck was confused by the arguments made below, Buck was required to specially except to the motion. *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 342 (Tex. 1993) ("An exception is required should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous.").

33

of the joint venture is provided: "The Joint Venture shall commence as of the date hereof and shall continue in existence for a period of FIVE (5) years, and thereafter from year-to-year unless it is sooner terminated, liquidated, or dissolved as hereinafter provided." The partnership agreement was signed April 27, 1984.

Buck argues that because the partnership commenced in 1984, the initial five-year term had long since expired by 1995. Thus, in 1995 when the alleged dissolution occurred, the partnership was in the middle of a year-to-year term, making dissolution an option without violating the partnership agreement. Buck argues that the purpose of having a partnership continue from year to year was to ensure that the expiration of the fixed term did not cause a dissolution. Essentially, he argues that the year-to-year term does not constitute a "fixed term" but is a mere saving provision that should be disregarded for purposes of dissolution.

Palmer points out, however, that although the partnership agreement states that the partnership can be terminated prior to the expiration of a year-to-year term "as hereinafter provided," the agreement does not provide for a method to terminate the partnership in the middle of the one-year additional terms. He disputes Buck's argument that the year-to-year provision was included merely to save the partnership from dissolving upon the expiration of the five-year initial term, pointing out that section 23 already provides for the continuation of a partnership as an "at will" partnership after a fixed term when there is no express agreement to the contrary. *Id.* § 23 ("When a partnership for a fixed term or particular undertaking is continued after the termination of such term or particular undertaking without any express agreement, the rights and duties of the partners remain the same as they were at such termination, so far as is consistent with a partnership at will.").

34

When possible, we are required to give effect to all the terms of a contract so that none of the provisions are rendered meaningless. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). Section 23 expressly contemplates that parties may agree to a contingent term upon the expiration of an initial fixed term to avoid becoming an "at will" partnership, and that is what the parties did in this case. Thus, section 23 requires this Court to assume that the partnership agreement fixed successive one-year terms following the expiration of the initial five-year term and was not merely included to prevent dissolution upon the expiration of the initial term. *Id.* § 23. We will not read the year-to-year provision in the contract as mere surplusage. *Kelley-Coppedge, Inc.*, 980 S.W.2d at 464. Because the dissolution occurred in the middle of a fixed, year-long term, Buck's dissolution violated the partnership agreement. *Id.* §31(2).

Section 38 provides for the application of partnership property after dissolution and distinguishes between partners who have dissolved the partnership in contravention of the partnership agreement and those who have not:

(1)     When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his co-partners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners. But if dissolution is caused by expulsion of a partner, bona fide under the partnership agreement and if the expelled partner is discharged from all partnership liabilities, either by payment or agreement under Section 36(2), he shall receive in cash only the net amount due him from the partnership.

(2)     When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows:

(a)     Each partner who has not caused dissolution wrongfully shall have,

35

(I)    All the rights specified in paragraph (1) of this Section, and

(II)   The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

(b)    The partners who have not caused the dissolution wrongfully, if they all desire to continue the business in the same name, either by themselves or jointly with others, may do so, during the agreed term for the partnership and for that purpose may possess the partnership property, provided they secure the payment by bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable under clause [2(a)(II)] of this Section, and in like manner indemnify him against all present or future partnership liabilities.

(c)    A partner who has caused the dissolution wrongfully shall have:

(I)    If the business is not continued under the provisions of paragraph (2b) all the rights of a partner under paragraph (1), subject to clause [2(a)(II)], of this Section;

(II)   If the business is continued under (2b) of this Section, the right as against his co-partners and all claiming through them in respect of their interests in the partnership, to have the value of his interest in the partnership, less any damages caused to his co-partners by the dissolution, ascertained and paid to him in cash, or the payment secured by bond approved by the court, and to be indemnified against all existing liabilities of the partnership; but in ascertaining the value of the partner's interest the value of the good-will of the business shall not be considered.

*Id.* § 38. Under section 38(2)(b), because Buck wrongfully dissolved the partnership, Palmer was entitled to continue the partnership but was required to pay Palmer "the value of his interest in the partnership *at the dissolution*, less any damages recoverable under clause [2(a)(II)] of this Section, and in like manner indemnify him against all present or

36

future partnership liabilities." *Id.* § 38(2)(b) (emphasis added).  Palmer elected to continue the partnership; therefore, Palmer was required to pay Buck the value of his interest in the partnership at dissolution and was also required to indemnify against "all present or future partnership liabilities."  *Id.*

Buck points to the partnership agreement and argues that the agreement itself requires distributions to be made "using the property's fair market value as of the time of distribution, as the basis for making the distribution." (emphasis added).  Thus, because there has not been a distribution, Buck is entitled to his share of the property's current fair market value.  We disagree that this provision requires Buck's value to be calculated at the date of distribution instead of the date of dissolution.

The agreement provides that "[t]he Joint Venture may be terminated upon any date specified in a notice of termination, signed by sixty percent (60%) in interest, not in numbers, of the Joint Venturers.  The death, incapacity, or dissolution of a Joint Venturer shall have no effect on the life of the Joint Venture, which shall continue."  Thus, dissolution under the agreement would not terminate the joint venture.

In contrast, the provisions for distribution of the partnership assets upon termination, which the agreement says can only be by a vote of sixty percent of the interests, contemplate liquidation:

> Upon such termination, the assets of the Joint Venture shall be applied as follows: to payment of the outstanding Joint Venture liabilities, although an appropriate reserve may be maintained in the amount determined by the manager or Trustee-in-Liquidation for any contingent liability until said contingent liability is satisfied, and the balance of such reserve, if any, shall be distributed together with any other sum remaining after payment of the outstanding Joint Venture liabilities to all of the Joint Venturers as their interest appears on Exhibit "A" unless otherwise provided herein.

In fact, the language Buck relies upon actually discusses the situation where a Joint

37

Venturer demands payment of his interest by use of the joint venture's property:

> No Joint Venturer shall be entitled to demand a distribution be made to him in Joint Venture Property, but the Manager may make or direct property distributions to be made, using the property's fair market value as of the time of distribution, as the basis for making the distribution.

Thus, the termination and distribution provisions do not apply to this situation, where Buck caused a dissolution of the partnership, but was not entitled to insist on termination. We find nothing in the agreement that requires Buck's interest be paid as of the date of the "distribution" as opposed to the date of dissolution as required by section 38. *See id.* In the absence of any provisions to the contrary, section 38 applies and requires the value be set at the date of dissolution. *See id*.

###     2.      Buck's Evidence of the Value at Dissolution

As we held above, Buck dissolved the partnership, at the very latest, on July 5, 1995. First, Buck points to appraisals of Queen Isabella's property that valued the property at $4,000,000. The appraisals he references provide estimates of the market value as of June 30, 2000 and as of July 15, 2008, neither of which are the dates of dissolution.

Second, Buck points to a meeting he attended on December 15, 1993, arguing that Palmer disregarded an appraisal conducted in 1992 and valued the property at $1,500,000. Again, the dissolution occurred in 1995, not in 1992 or 1993. And in any event, in 1992, Texas Trust obtained a judgment against Queen Isabella for $14,865,977.80 and against Buck and Palmer individually for forty percent of that amount, or $5,946,391.12, under the terms of their guaranty. Thus, even if we accepted the value stated by Palmer in December 1993, the partnership's liabilities at that time exceeded the estimated value by more than $13 million. Buck then argues that in 1998, the property had increased in value to $2,060,000. Yet again, 1998 is not the relevant date.

Although Buck points to the September 29, 1995 settlement agreement, which reduced the partnership's liabilities to a $600,000 note payable to 1629, Buck does not provide any evidence of the value of the partnership's real property at that time. Buck points to other evidence in the record that he claims "refers to other property owned by the joint venture, for which Palmer fails to account, including recovery in the construction defects litigation." The evidence shows that in the construction defects litigation, one of the defendants settled the suit with Palmer, Queen Isabella, and 1629 for $195,000. The evidence does not, however, show how these amounts were allocated between these parties. Buck participated in the settlement as well, receiving $5,000. Because the only evidence Buck presented showed that the partnership had at least $600,000 in debt, but none of Buck's evidence provides a value for the partnership property at the time of dissolution, the evidence shows nothing more than a negative value for the partnership. Thus, the trial court did not err in granting summary judgment that Buck take nothing on all his claims. We overrule Buck and Queen Isabella's first issue.

## V. DISCOVERY OF PALMER'S FINANCIAL STATEMENTS

By their third issue, Buck and Queen Isabella argue that the trial court erred by denying them discovery of Palmer's financial statements, which they argue would have shown the value of Queen Isabella at the date of the alleged dissolution. For this reason, they argue that the summary judgment should be reversed. We disagree.

"If the trial court abuses its discretion in a discovery ruling, the complaining party must still show harm on appeal to obtain a reversal." *Ford Motor Co. v. Castilllo*, 279 S.W.3d 656, 667 (Tex. 2009) (citing TEX. R. APP. P. 44.1(a)). An error is harmful if it "probably caused the rendition of an improper judgment" or "probably prevented the

39

appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a).

The trial court reviewed the financial statements in camera, and so have we. The documents submitted to the court as responsive to the discovery requests include Palmer's personal financial statements for the following dates: December 31, 1999; August 31, 2000; December 31, 2000; July 31, 2001; December 31, 2001; March 31, 2002; and July 31, 2003. The relevant time period for valuing Queen Isabella's property was the date of dissolution, in the summer of 1995, which was more than four years prior to the first financial statement appearing in the record. Thus, Buck has failed to show that the trial court's denial of his discovery in this regard has caused any harm, as this evidence would not have supported his claim that the value of Queen Isabella was greater than zero at the date of dissolution. For this reason, we cannot say that the trial court abused its discretion in denying discovery of Palmer's financial records. *Martin v. Commercial Metals Co.,* 138 S.W.3d 619, 624 (Tex. App.–Dallas 2004, no pet.) (holding that the non-movant failed to show "how any of the information he sought could have changed the outcome of the summary judgment process," and thus "failed to show how he was harmed by the lack of further discovery"). Accordingly, we overrule Buck and Queen Isabella's third issue.

## VI. CONCLUSION

Having overruled all of Buck and Queen Isabella's issues, we affirm the trial court's summary judgment.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
21st day of December, 2010.